■ WANDA RIVERA et al., Appellants-Respondents, v DEBRA GREENSTEIN, M.D., et al., Respondents-Appellants, et al., Defendant. [914 NYS2d 94]—

Order, Supreme Court, Bronx County (Howard R. Silver, J.), entered May 14, 2009, that, after a jury verdict in plaintiffs' favor, denied the motion of defendants Greenstein and Pediatric Associates for a judgment notwithstanding the verdict and granted the alternative relief of setting aside the verdict, but only to the extent of directing a new trial as to damages unless plaintiffs stipulate to a reduction of the jury's $3,000,000 pain and suffering award to $150,000, unanimously reversed, on the law, without costs, the motion to set aside the verdict granted and the complaint dismissed as against defendants Greenstein and Pediatric Associates. The Clerk is directed to enter judgment accordingly.

This is a medical malpractice action. Plaintiffs claim defendants' alleged failure to diagnose and treat the infant decedent for myocarditis[1] resulted in his death. After the jury rendered a verdict in favor of plaintiffs, the trial court directed a new trial as to damages unless plaintiffs stipulated to reduce the jury's $3,000,000 pain and suffering award to $150,000. Plaintiffs appealed the trial court's determination as to the pain and suffering award. Defendants Dr. Debra Greenstein and Pediatric Associates cross-appeal the trial court's denial of their motion for a judgment notwithstanding the verdict. Because there was insufficient proof to support the verdict, we reverse and grant defendants' motion for judgment notwithstanding the verdict.

On December 22, 2003, plaintiffs took their four-year-old son who was sick with flu-like symptoms including cough and congestion, to see defendant Debra Greenstein, M.D. at her of-

---

1. Myocarditis means "[i]nflammation of the muscular walls of the heart" (Stedman's Medical Dictionary [27th ed 2000], myocarditis).

fice at Pediatric Associates of New York.[2] Dr. Greenstein examined plaintiffs' son, diagnosed pneumonia and prescribed an antibiotic. At that time, Dr. Greenstein did not take any X rays or order any blood work. Four days later, plaintiffs' son was still unwell, was lethargic and was not eating.

On December 27, 2003, Mrs. Rivera brought her son back to Dr. Greenstein's office, at which time the doctor had him admitted to New York University Medical Center (NYU) with a diagnosis of a viral infection that had led to dehydration and pneumonia. At the time of admission, a single position X ray revealed pneumonia and blood tests revealed elevated creatine phosphkinase (CPK) levels, as well as elevated liver enzyme levels (LDH), and transaminase.

On December 28, 2003, plaintiffs' son's CPK levels were tested at greater than 4800 (normal is under 200), and on December 30th, the CPK levels were at 24,000. On December 31, 2003, Dr. Greenstein discharged plaintiffs' son from the hospital with a diagnosis of inflammatory myositis.[3] At that time, Dr. Greenstein saw no signs that this condition was causing any damage to the heart. For instance, the heart rate and rhythm were normal. There was no enlarged heart on the chest X ray. Nor did he have any sign of congestive heart failure.[4]

Accordingly, Dr. Greenstein did not order a baseline electrocardiogram (EKG). Nor did she order a baseline CPK upon admission or follow-up or test the elevated CPK blood level with a CK-MB test. In addition, Dr. Greenstein did not order a serum troponin blood test. As there was no clinical reason to involve a cardiologist, she did not have a cardiologist perform an evaluation.

On January 5, 2004, plaintiffs returned to Dr. Greenstein's office. Their son was still very weak and had an extremely elevated CPK level of 32,710, as well as other abnormal lab results. Dr. Greenstein's impression was that the viral illness that had led to his pneumonia had also led to inflammatory myositis. Again, as there was no sign of injury to the heart, Dr. Greenstein did not order a CK-MB blood test, an EKG, a serum troponin test or arrange a consultation with a cardiologist.

On January 12, 2004, plaintiffs again returned, and Dr.

---

**2.** Dr. Greenstein first saw plaintiffs' son when the infant was 2½ years old, noted that the child had neurological issues, and referred him to Dr. Wells, a pediatric neurologist who began working with him.

**3.** Inflammatory myositis is inflammation of a muscle (Stedman's Medical Dictionary [27th ed 2000], myositis).

**4.** Congestive heart failure occurs when the heart cannot pump enough blood to meet the body's needs (www.mayoclinic.org).

Greenstein sent more bloodwork to Quest Diagnostics for a test of CPK and liver enzyme levels, both of which remained elevated. On its own initiative, Quest conducted a CK-MB test, that revealed a level of 239.9 compared to a normal reference range of 0.0 to 3.2. Quest made these results available on January 13, 2004. With respect to the CK-MB test, Quest notes, "These results are neither diagnostic nor non-diagnostic of myocardial injury. Collect another specimen if clinically indicated." Although the overall CPK remained elevated at 15,862 and the CK-MB was elevated at 239.9, the ratio of CK-MB to total CPK was only 1.51%, a ratio within normal limits. Defendants' expert claims this ratio confirms that the elevated CPKs were not from damaged heart muscle but, instead, were from skeletal tissue damage. Moreover, there are no clinical or laboratory findings in the record of a kind one would expect to see if myocarditis were an issue, including decreased oxygen, fluid on the lungs, fluid retention, inflammation of the heart and an enlarged liver.

Suspecting a neurodegenerative disorder, rather than a cardiac problem, Dr. Greenstein referred plaintiffs to Dr. Wells, who examined their son on January 15, 2004. Dr. Wells ordered a brain MRI, but the results were normal. During this MRI, the child was under sedation and an anesthesiologist constantly monitored his cardiac status. No cardiac abnormalities were noted.

On January 24, 2004, plaintiff mother called Dr. Greenstein to report that her son had suffered a seizure. Dr. Greenstein advised her to bring him to NYU for an electroencephalogram (EEG). On January 26, 2004, plaintiffs' son had another seizure, and on the next day he had an EEG at NYU.

On January 28, 2004, plaintiffs' son suffered another seizure and stopped breathing. His father resuscitated him. An ambulance took plaintiffs' son to Bellevue Hospital where he died. Bellevue Hospital and the Medical Examiner's Office each performed autopsies. According to the autopsy from Bellevue, the cause of death was "acute myocarditis and tracheobronchitis." However, the autopsy showed that on gross inspection both the heart and the liver appeared normal. The Bellevue autopsy found microscopic evidence of focal myocyte necrosis on 2 out of 34 slides. The autopsy from the Medical Examiner, dated January 30, 2004, noted "no myocyte necrosis was identified" and that "the foci of myocyte damage were not present in the OCME sections."

The court charged the jury to answer whether Dr. Debra Greenstein departed from good and accepted medical practice

by: (1) failing to order a CK-MB test, (2) failing to order an EKG, (3) failing to order serum troponin testing, (4) failing to refer her patient for a cardiac evaluation, and (5) failing to hospitalize her patient or bring him to her office on January 24, 2004. The jury answered "yes" in each instance. The jury also answered "yes" in each instance to the follow-up question "was such departure a substantial factor in causing [plaintiffs' son's] death?" The jury awarded $3 million in damages.

The court denied that portion of defendants' motion seeking judgment notwithstanding the verdict and that portion seeking to set aside the verdict as against the weight of the evidence. However, because it found the verdict excessive, the court ordered a new trial on damages unless plaintiffs agreed to a reduced amount of $150,000.

Defendants argue that, given that there were no other reports or findings to support the diagnosis of myocarditis, it was likely a "subclinical finding." Plaintiffs maintain that because Dr. Greenstein knew that her patient suffered from a virus and because both autopsy reports list the cause of death as viral myocarditis, the jury could rationally infer that if Dr. Greenstein had ordered heart-related tests a month earlier, she would have discovered the cardiac involvement and plaintiffs' son would have received the medical care he needed to survive the illness.

To succeed in a medical malpractice action, it is necessary for the plaintiff to show a departure from the accepted standard of medical practice, and that this departure was a proximate cause of the patient's injuries (*see Alvarado v Miles*, 32 AD3d 255 [2006], *affd* 9 NY3d 902 [2007]; *English v Fischman*, 266 AD2d 6 [1999], *lv denied* 94 NY2d 760 [2000]). Competent medical proof as to causation is usually essential (*see Stanski v Ezersky*, 228 AD2d 311 [1996], *lv denied* 89 NY2d 805 [1996]). An expert offering only conclusory assertions and mere speculation that a doctor could have discovered the condition and successfully treated the patient does not support liability (*see Rodriguez v Montefiore Med. Ctr.*, 28 AD3d 357 [2006]; *Bullard v St. Barnabas Hosp.*, 27 AD3d 206 [2006]).

The court should have set aside the verdict in its entirety because plaintiffs did not present evidence from which the jury could infer liability. First, plaintiffs failed to present evidence from which a jury could find that Dr. Greenstein departed from accepted standards of medical practice. Plaintiffs point to the blood tests that showed elevated liver enzymes with normal liver findings and elevated CPK, as well as the CK-MB test of 239.9 on January 12, 2004, and that their son was irritable, unresponsive and had to be carried. Plaintiffs claim that these

symptoms indicated cardiac involvement. However, as plaintiffs admit, these tests and symptoms could also indicate problems with other areas of the body, such as inflammatory myositis. All tests indicated that the child's heart was normal. The clinical and laboratory findings one would expect to see in myocarditis, such as fluid in the lungs, were not present when Dr. Greenstein performed her examination. Plaintiffs point to the Bellevue autopsy that listed the cause of death as myocarditis. However, this autopsy found only microscopic evidence of myocarditis. Putting aside that the Medical Examiner's Office found no evidence of myocarditis, the microscopic evidence that Bellevue found certainly could not have been discovered while plaintiffs' son was alive. The autopsy gives the benefit of hindsight that defendant, of course, did not have.

Nor do plaintiffs ever postulate what medical care their son should have received for his presumed heart condition that would have made a difference. Plaintiffs' expert, Dr. Heitler, suggests that the child could have been treated for congestive heart failure, but the record reflects unequivocally that he had no symptoms of congestive heart failure. Nor was there evidence of arrhythmia or other cardiac condition amenable to treatment. Dr. Heitler also hypothesizes that "they also could have—put him at rest which is the—and support him at that time, but also they could have prevented further involvements, such as clots being formed in the ventricle and causing strokes or infarcts." This is also speculative and insufficient because it fails to specify any actual treatment. Moreover, the record does not support the existence of a blood clot.

Because plaintiffs failed to render an opinion as to what Dr. Greenstein could have done to save their son had she discovered myocarditis, the record is inadequate to establish proximate cause. A judgment notwithstanding the verdict therefore should have been granted. Concur—Andrias, J.P., McGuire, Moskowitz, Acosta and DeGrasse, JJ.