# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**975**
**CA 13-01421**
PRESENT: SMITH, J.P., FAHEY, LINDLEY, AND VALENTINO, JJ.

---

JANICE MAZELLA, AS ADMINISTRATRIX OF THE ESTATE
OF JOSEPH MAZELLA, DECEASED,
PLAINTIFF-RESPONDENT,

V              MEMORANDUM AND ORDER

WILLIAM BEALS, M.D., DEFENDANT-APPELLANT,
ET AL., DEFENDANT.
(APPEAL NO. 3.)

---

GALE GALE & HUNT, LLC, SYRACUSE, MEISELMAN, PACKMAN, NEALON, SCIALABBA
& BAKER P.C., WHITE PLAINS (MYRA I. PACKMAN OF COUNSEL), FOR
DEFENDANT-APPELLANT.

DEL DUCHETTO & POTTER, SYRACUSE (ERNEST A. DEL DUCHETTO OF COUNSEL),
AND ALESSANDRA DEBLASIO, NEW YORK CITY, FOR PLAINTIFF-RESPONDENT.

---

Appeal from an amended judgment of the Supreme Court, Onondaga
County (John C. Cherundolo, A.J.), entered May 21, 2013.  The amended
judgment, insofar as appealed from, awarded plaintiff money damages
upon a jury verdict.

It is hereby ORDERED that the amended judgment so appealed from
is affirmed without costs.

Memorandum:  In this medical malpractice and wrongful death
action, William Beals, M.D. (defendant) appeals from an amended
judgment awarding money damages to plaintiff.  We reject defendant's
contention that Supreme Court erred in denying his posttrial motion
seeking to set aside the verdict on the ground that plaintiff had
failed to establish a prima facie case of medical malpractice.  To
establish his entitlement to that relief, defendant was required to
establish that the evidence was legally insufficient to support the
verdict, i.e., "that there [was] simply no valid line of reasoning and
permissible inferences which could possibly lead rational [persons] to
the conclusion reached by the jury on the basis of the evidence
presented at trial" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499).  On
this record, we conclude that "there is a valid line of reasoning
supporting the jury's verdict that defendant deviated from the
applicable standard of care in [his treatment] of plaintiff's
[decedent] . . . , and that such deviation was a proximate cause of
[the] injuries" of plaintiff's decedent (*Winiarski v Harris* [appeal
No. 2], 78 AD3d 1556, 1557; *see generally Sacchetti v Giordano*, 101
AD3d 1619, 1619-1620).  We also reject defendant's alternative

contention in support of his posttrial motion that the verdict is
against the weight of the evidence, i.e., that the evidence so
preponderated in defendant's favor that the verdict in favor of
plaintiff could not have been reached on any fair interpretation of
the evidence (*see generally Lolik v Big V Supermarkets*, 86 NY2d 744,
746).  Here, we conclude that "the 'trial was a prototypical battle of
the experts, and the jury's acceptance of [plaintiff's] case was a
rational and fair interpretation of the evidence' " (*Holstein v
Community Gen. Hosp. of Greater Syracuse*, 86 AD3d 911, 912, *affd* 20
NY3d 892).  With respect to our dissenting colleague's summary of the
testimony of plaintiff's expert, we respectfully note that there may
have been more than one proximate cause of decedent's injuries (*see
generally Argentina v Emery World Wide Delivery Corp.*, 93 NY2d 554,
560 n 2), and that the jury was entitled to credit plaintiff's theory
that defendant's actions constituted one of those proximate causes.

Defendant further contends that the verdict must be set aside and
a new trial granted because, inter alia, he was denied a fair trial by
the admission in evidence of certain documents of the Office of
Professional Medical Conduct.  Even assuming, arguendo, that the court
erred in admitting those documents in evidence, defendant's contention
lacks merit inasmuch as "that . . . error 'would not have affected the
result'[,] and . . . any such error therefore is harmless" (*Cook v
Oswego County*, 90 AD3d 1674, 1675).

Contrary to defendant's further contention, the court's failure
to submit a special verdict sheet to the jury was not prejudicial and
does not require a new trial (*see Suarez v New York City Health &
Hosps. Corp.*, 216 AD2d 287, 287; *see also Kolbert v Maplewood
Healthcare Ctr., Inc.*, 21 AD3d 1301, 1301-1302).  We have considered
defendant's remaining contentions and, to the extent that they are
properly before us, we conclude that they lack merit.

All concur except SMITH, J.P., who dissents and votes to reverse
the amended judgment insofar as appealed from in accordance with the
following Memorandum:  Because I disagree with the majority's
conclusion that the negligence of defendant William Beals, M.D.
(defendant) was a proximate cause of the suicide of Joseph Mazella
(decedent), I respectfully dissent.  I would reverse the amended
judgment insofar as appealed from, grant defendant's motion to set
aside the verdict as against the weight of the evidence (*see generally
Dentes v Mauser*, 91 AD3d 1143, 1145-1146, *lv denied* 19 NY3d 811;
*Rivera v Greenstein*, 79 AD3d 564, 568-569), and dismiss the complaint
with respect to defendant.

The evidence at trial established that defendant treated decedent
for depression and other mental health conditions for many years
before 2009 by, inter alia, prescribing medications.  The evidence
further established that defendant did not personally see decedent
during approximately the last 10 years of that time, and defendant
admitted that such was negligent conduct.  Decedent's condition flared
up again and, on August 9, 2009, he telephoned defendant, who was on
vacation.  There is evidence in the record from which the jury could
have concluded that decedent had either reduced the dosage of the

medication prescribed by defendant or had stopped taking the medication prior to telephoning defendant, although there is also evidence in the record from which the jury could have drawn the contrary conclusion.  During that telephone call, defendant changed the dosage of decedent's medication and prescribed an additional medication.  During a telephone call the next day, defendant again adjusted decedent's medications.

The day after that, plaintiff telephoned defendant and informed him that she was concerned about decedent's condition.  Defendant advised her to take decedent to a nearby hospital's Comprehensive Psychiatric Emergency Program (CPEP), which she did, and decedent was hospitalized overnight.  Defendant met with decedent and plaintiff at defendant's office several days later, on August 17, 2009.  Although the record contains varying descriptions of the interactions between those three people during that meeting, it is clear that defendant's last contact with decedent occurred at that time, and defendant referred decedent to CPEP for further treatment.

Even assuming, arguendo, that the above evidence and the other evidence introduced by plaintiff at trial was sufficient to establish that defendant was negligent in his treatment of decedent up until that time, it is undisputed that decedent received significant medical treatment after his last contact with defendant.  The evidence at trial established that, after his last meeting with defendant, decedent went to CPEP, where the physicians recommended that decedent enter an inpatient psychiatric facility, but decedent declined to follow that advice.  Decedent was treated overnight at CPEP and then released, and the treating physician who released decedent prescribed different medications than those that had been prescribed by defendant.  The physician at CPEP thought that decedent should not be released, but decedent and plaintiff convinced the physician that plaintiff and decedent's other family members could care for him at home.  Decedent returned to CPEP the next day and was admitted, and he was later transferred to the inpatient psychiatric unit of another hospital.  Decedent remained there for about a week, during which time another psychiatrist changed his medications again and prescribed other treatment for his condition.  Decedent was released from that facility because the physicians there concluded that he was not suicidal, and that his condition had improved sufficiently to allow him to continue treatment on an outpatient basis.  None of the medical professionals who saw decedent during the week after his discharge from the inpatient psychiatric unit thought he was suicidal, and plaintiff wrote a note during that time frame indicating that she thought decedent was "80-90% better."

Decedent was released from inpatient psychiatric treatment under a regimen of medications that was different from the medications prescribed by defendant, and some of those medications carried warnings that they were not to be prescribed to those at risk of suicide.  Rather than referring decedent to a psychiatrist upon discharge, the psychiatrist at the hospital referred him to a psychiatric clinic that had approximately a four-week intake process.  When plaintiff spoke with the hospital's psychiatrist after decedent's

discharge and expressed concern regarding the newly-prescribed medications, the psychiatrist told her to have decedent continue taking one of the medications, but also said that decedent could discontinue the other.  Before decedent's application to be accepted for treatment at the psychiatric clinic was completed, decedent committed suicide.

"The standard for determining whether the jury's verdict is against the weight of the evidence is whether the evidence so preponderated in [the aggrieved party's] favor that the verdict could not have been reached on any fair interpretation of the evidence" (*Paterson v Ellis*, 284 AD2d 981, 981; *see Lolik v Big V Supermarkets*, 86 NY2d 744, 746; *Nicastro v Park*, 113 AD2d 129, 134).  Here, I agree with defendant that the jury's finding that the intervening acts of the other medical providers involved in decedent's care was not an intervening, superseding cause of decedent's injuries is not supported by the weight of the evidence.

"Ordinarily, a plaintiff asserting a medical malpractice claim must demonstrate that the doctor deviated from acceptable medical practice, and that such deviation was a proximate cause of the plaintiff's injury" (*James v Wormuth*, 21 NY3d 540, 545).  "To establish proximate cause, a 'plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury' " (*Pomeroy v Buccina*, 289 AD2d 944, 945, quoting *Derdiarian v Felix Contr. Corp.*, 51 NY2d 308, 315, *rearg denied* 52 NY2d 784; *see Kush v City of Buffalo*, 59 NY2d 26, 32-33).  Here, I agree with defendant that the verdict is against the weight of the evidence under the circumstances presented because plaintiff failed to establish that defendant's negligence was a proximate cause of decedent's suicide.  To the contrary, I conclude that the psychiatric treatment provided to decedent after defendant's involvement in the case ended constituted an intervening act that severed any causal connection between defendant's negligence and decedent's suicide. " 'An intervening act will be deemed a superseding cause and will serve to relieve defendant of liability when the act . . . so attenuates defendant's negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant' " (*Gardner v Perrine*, 101 AD3d 1587, 1587-1588, quoting *Kush*, 59 NY2d at 33).  Thus, "[i]f the negligent act of the third party is extraordinary under the circumstances and unforeseeable as a normal and probable consequence of defendant's negligence, then the third party's negligence supersedes that of the defendant and relieves defendant of liability" (*DePesa v Westchester Sq. Med. Ctr.*, 239 AD2d 287, 288-289).

Here, the weight of the evidence establishes that decedent's condition improved after defendant stopped treating him, and that the immediate cause of his death was either the disease from which he suffered or the medications that he took prior to his suicide.  It is undisputed that defendant did not prescribe any medications for decedent for approximately one month prior to his death, and defendant obviously did not cause the underlying disease that all of the defendants were involved in treating.

Plaintiff offered the testimony of a medical expert who opined that defendant was negligent in prescribing decedent's medication, which caused decedent to become so overmedicated that he was in a toxic state, and that defendant was additionally negligent by refusing to provide care for decedent thereafter. That same expert, however, testified that the later treatment providers were negligent and, most notably, that the psychiatrist who released decedent from the inpatient psychiatric unit at the hospital was "where the buck stops. The buck stops with the psychiatrist to make sure [decedent] got help, . . . [and] if the social worker hadn't got the job done, to make sure somebody else got it done." Thus, even according to the testimony of plaintiff's expert, liability for decedent's suicide lay with the final treating psychiatrist.

Consequently, based on the different regimen of medications that decedent had been prescribed, which were different from the medications that decedent had taken while under the care of defendant, plus the extensive medical treatment provided by other medical professionals for several weeks, and their prescription of medications that have an increased risk of suicide, all of which took place after defendant's treatment of decedent ended, I conclude that any causal connection between defendant's prior negligent treatment of decedent and decedent's suicide was severed. Thus, "there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented at trial" (*Cohen v Hallmark Cards, Inc.*, 45 NY2d 493, 499).

I further conclude that defendant was deprived of a fair trial by an evidentiary error, i.e., the admission in evidence of a consent agreement that defendant had signed with the Office of Professional Medical Conduct (OPMC), and that such error undoubtedly contributed to the legal error of the jury's determination of defendant's liability. The OPMC had charged defendant with negligence regarding 13 patients, and decedent is listed as patient A in OPMC's charges against defendant. Defendant thereafter signed a consent agreement with OPMC, in which he agreed not to contest the allegations with respect to those who were designated patients B through M in the consent agreement.

During cross-examination at trial, defendant admitted that he had failed to appropriately monitor decedent while he was on medication. Plaintiff's attorney then asked whether that constituted medical malpractice. After Supreme Court overruled the objection of defendant's attorney, defendant indicated that it was not. The court then permitted plaintiff's attorney to introduce the consent agreement in evidence and to use it to impeach defendant. That was error.

First, the question that plaintiff's attorney asked defendant called for defendant to admit that he had committed medical malpractice with respect to his treatment of decedent. Defendant admitted that he was negligent in his care of certain patients but, as noted above, it is well settled that the elements of "a medical malpractice [claim] are a deviation or departure from accepted

community standards of practice and evidence that such departure was a proximate cause of injury or damage" (*Geffner v North Shore University Hosp*. 57 AD3d 839, 842; *see Foster-Sturrup v Long*, 95 AD3d 726, 727). Inasmuch as defendant did not admit to either medical malpractice or all the elements of a claim of medical malpractice by signing the consent agreement, the court should have sustained the objection of defendant's attorney to the question as asked.

Next, even assuming, arguendo, that defendant had admitted to medical malpractice by signing the consent agreement, and that it was permissible for plaintiff to use an alleged prior inconsistent statement to impeach the credibility of a witness that she herself had called (*see generally Jordan v Parrinello*, 144 AD2d 540, 541), it is clear that defendant did not admit to any negligence in the consent agreement with respect to decedent. Moreover, because defendant admitted in the consent agreement to negligence only with respect to the 12 other patients, the consent agreement did not constitute a prior inconsistent statement in the context of the issues at trial and defendant's testimony, both of which concerned only decedent. Given the highly prejudicial nature of the statements in the consent agreement, i.e., that decedent admitted that he failed to provide proper care to 12 patients other than decedent, as well as the complete lack of either probative value to the issues at trial or relevance for impeachment purposes, I conclude that defendant was deprived of a fair trial by the admission of the consent agreement in evidence, and by permitting plaintiff's attorney to cross-examine defendant regarding it.

Entered:  November 21, 2014                    Frances E. Cafarell
                                               Clerk of the Court