■ DIANE MANGANIELLO et al., Respondents, v MOINUDDIN AHMED, M.D., Appellant, et al., Defendants. [13 NYS3d 206]—

In an action, inter alia, to recover damages for medical mal-

practice, etc., the defendant Moinuddin Ahmed appeals, as limited by his brief, from so much of an order of the Supreme Court, Orange County (Berry, J.), dated July 20, 2012, as denied his motion pursuant to CPLR 4404 (a) to set aside a jury verdict on the issue of liability in favor of the plaintiffs and for judgment as a matter of law or, alternatively, for a new trial.

Ordered that the order is reversed insofar as appealed from, on the law, with costs, and that branch of the motion of the defendant Moinuddin Ahmed which was to set aside the jury verdict on the issue of liability in favor of the plaintiffs and for judgment as a matter of law is granted.

The plaintiff Diane Manganiello (hereinafter Manganiello) was admitted to the emergency department of the defendant Bon Secours Community Hospital (hereinafter the hospital) at 2:37 p.m. on January 3, 2004. In a blood sample taken at 3:55 p.m., her serum sodium level was measured at 99 mmol/L, a level that an expert described at trial as "eye-poppingly low." According to the evidence adduced at trial, a low sodium level in the blood is a condition known as hyponatremia. Evidence at trial supported the contention that Manganiello's hyponatremia was related to another condition she was suffering from, syndrome of inappropriate anti-diuretic hormone (SIADH), which caused her to retain fluids. An emergency room physician ordered that Manganiello be given a steroid to increase her urine output and that she be given 100 ccs of a 5% hypertonic saline solution over the course of six hours. A 5% saline solution is approximately $5\frac{1}{2}$ times the normal ("isotonic") concentration of .9%. A nurse, however, misread the order and gave Manganiello the entire 100 ccs of 5% saline over the course of only one hour.

Another measurement of Manganiello's serum sodium level was taken at 6:15 p.m., after Manganiello had received the steroid and the entire hypertonic infusion. In the approximately $2\frac{1}{2}$-hour period since the previous level was taken, Manganiello's serum sodium level had risen by 9 mmol/L, from 99 mmol/L to 108 mmol/L. The appellant, Dr. Moinuddin Ahmed, did not arrive at the hospital until after the steroid had already been given and Manganiello had already received the entire 100 ccs of the 5% solution. He ordered that she be given isotonic (.9%) saline. He also dictated a treatment note at 7:49 p.m., in which he ordered that her blood be tested every four hours. By 10:15 p.m. on January 3, 2004, Manganiello's serum sodium level had increased to 112 mmol/L; by 2:14 a.m. on January 4, 2004, it had increased to 117 mmol/L; and by 6:20 a.m., it had

reached 126 mmol/L. Manganiello's clinical appearance seemed to be much improved on January 4, 2004, but on January 5, 2004, two days after Manganiello arrived at the hospital, her condition deteriorated significantly. It is undisputed that she suffered severe brain injury.

Manganiello, and her husband suing derivatively, commenced this action against, among others, the nurse, the hospital, and the appellant. The plaintiffs' medical experts, Dr. Richard Sterns and Dr. Brian-Fred Fitzsimmons, diagnosed Manganiello's brain injury as "extrapontine myelinolysis" (hereinafter EPM), which, they opined, was caused by a too-rapid decrease in fluid in certain brain cells. The plaintiffs contended that the defendants were responsible for Manganiello's EPM, because they caused or permitted her serum sodium level to increase too rapidly, thus causing the too-rapid loss of fluid in those cells. The plaintiffs contended that the appellant should have intervened to halt, or at least slow, the increase in Manganiello's serum sodium level.

According to Dr. Sterns and Dr. Fitzsimmons, by the time the appellant became responsible for Manganiello's care, her serum sodium level had increased, in only approximately 2½ hours, to approximately the maximum amount it should have been permitted to increase in a 24-hour period. Dr. Sterns testified that it was the appellant's responsibility to "maintain and prevent the serum sodium concentration from continuing to rise and he's essentially got to keep it and try to minimize any further increase in the serum sodium over the next nearly 24 hours." Dr. Sterns testified that there was no evidence that the appellant had done anything to keep Manganiello's serum sodium levels from continuing to rise. He opined that the appellant's failure to manage Manganiello's serum sodium level was a departure from the standard of care and was a cause of her brain injury.

Before the case was submitted to the jury, the appellant moved for a directed verdict. The court reserved decision. The jury returned a verdict in favor of the plaintiffs and against the appellant, the hospital, and the nurse, awarding substantial damages. It found the nurse who had misread the doctor's note regarding the infusion rate of the hypertonic saline to be 40% at fault and the appellant to be 60% at fault.

The appellant moved pursuant to CPLR 4404 (a) to set aside the jury verdict on the issue of liability and for judgment as a matter of law, or for a new trial. He contended, inter alia, that the plaintiffs failed to establish, prima facie, that he had departed from the standard of care in his treatment of

Manganiello and, in any event, failed to prove that anything he did or failed to do contributed to her brain injury. The Supreme Court denied the motion.

In a medical malpractice action, the plaintiff must prove that the defendant departed from the applicable standard of care and that the defendant's departure was a proximate cause of the plaintiff's injuries (*see James v Wormuth*, 21 NY3d 540, 545 [2013]; *Scarpati v Kim*, 124 AD3d 866, 866 [2015]; *Semel v Guzman*, 84 AD3d 1054, 1055 [2011]; *Stukas v Streiter*, 83 AD3d 18, 23 [2011]). Generally, expert testimony is required to prove these two elements (*see James v Wormuth*, 21 NY3d at 546-547; *Semel v Guzman*, 84 AD3d at 1055; *Goldberg v Horowitz*, 73 AD3d 691, 693 [2010]), except in the very rare instances where "the very nature of the acts complained of bespeaks improper treatment and malpractice" (*Hammer v Rosen*, 7 NY2d 376, 380 [1960]; *see generally Pipers v Rosenow*, 39 AD2d 240, 243 [1972]).

A court may grant a defendant's motion for judgment as a matter of law only when it concludes, after considering the facts in the light most favorable to the plaintiff and affording the plaintiff every favorable inference that may reasonably be drawn from the facts presented, that there is no rational process by which the jury could have found in the plaintiff's favor (*see Messina v Staten Is. Univ. Hosp.*, 121 AD3d 867, 867-868 [2014]; *Modawar v Staten Is. Med. Group, P.C.*, 105 AD3d 1021, 1021 [2013]; *Goldberg v Horowitz*, 73 AD3d at 693; *Alicea v Ligouri*, 54 AD3d 784, 785 [2008]). An appellate court must apply this "no rational process" test in reviewing the sufficiency of evidence supporting a verdict (*see Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]; *Abbatantuono v Boolbol*, 115 AD3d 892, 893 [2014]; *Bailey v Brookdale Univ. Hosp. & Med. Ctr.*, 98 AD3d 545, 546 [2012]; *Goldberg v Horowitz*, 73 AD3d 691, 693-694 [2010]).

The appellant contends that the plaintiffs failed to present legally sufficient proof that he departed from the standard of care. Specifically, he contends that they failed to present evidence that anything he did contributed to the increase in Manganiello's serum sodium level, or that there was anything he could have done to manage it in light of what had already occurred before he became responsible for Manganiello's care.

At the outset, we note that the evidence was sufficient to establish that Manganiello's brain injury was the result of EPM caused by the too-rapid increase in her serum sodium level. The evidence was also sufficient to establish that the increase in Manganiello's serum sodium level was the result of medical

treatment, specifically the steroid that was given to stimulate urine output and the hypertonic saline solution that was infused at the direction of the emergency room physician.

The evidence presented at trial, however, did not establish that the appellant could have done anything to slow or stop the increase in Manganiello's serum sodium level. By the time the appellant became responsible for Manganiello's care, her serum sodium level had already increased in a very short time by approximately the maximum amount it should have been permitted to rise in a 24-hour period, and it was continuing to increase. No expert testified that the appellant's use of isotonic (i.e., normal) saline was inappropriate, or that the rate at which it was being infused was improper. Finally, there was no affirmative evidence as to what course of action the appellant could or should have taken. Although there was general testimony regarding how serum sodium levels could be adjusted by the use of different concentrations of hypertonic (i.e., higher than normal) saline, that evidence was irrelevant to this case. Indeed, in light of how much, and how quickly, Manganiello's serum sodium level had already increased, the use of varying concentrations of hypertonic saline was a moot point; it is undisputed that the appellant ordered the use of isotonic saline, not hypertonic saline.

Contrary to the plaintiffs' contention, this case is not about any claimed need to establish precisely what a defendant physician should have done (*see Turcsik v Guthrie Clinic, Ltd.*, 12 AD3d 883, 887 [2004]), but about the plaintiffs' failure to prove that the appellant departed from the standard of care at all. In the absence of evidence as to what a reasonably prudent doctor could have done to arrest the increase in Manganiello's serum sodium levels, Dr. Sterns's testimony that the appellant departed by failing to manage that increase was entirely conclusory. Moreover, it required the jury to speculate that in the complex medical intervention that Manganiello needed, there was something that the appellant could have done that he could be faulted for not having done (*see Shashi v South Nassau Communities Hosp.*, 104 AD3d 838, 839 [2013]; *Rivera v Greenstein*, 79 AD3d 564, 568-569 [2010]; *cf. Graham v Mitchell*, 37 AD3d 408, 409 [2007]; *see generally Goldhirsh Group, Inc. v Alpert*, 107 F3d 105, 108 [2d Cir 1997]).

Accordingly, in the absence of legally sufficient proof that the appellant departed from the standard of care, his motion to set aside the jury verdict on the issue of liability in favor of the plaintiffs and for judgment as a matter of law should have been granted.

In light of our determination, we need not address the appellant's remaining contention. Balkin, J.P., Chambers, Miller and Hinds-Radix, JJ., concur.