Cabrera v Golden (2024 NY Slip Op 04112)

Cabrera v Golden

2024 NY Slip Op 04112

Decided on August 01, 2024

Appellate Division, First Department

MENDEZ, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: August 01, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Peter H. Moulton
David Friedman Ellen Gesmer Manuel Mendez Julio Rodriguez III

Index No. 25781/16 Appeal No. 1676 Case No. 2023-00894, 2023-01435 

[*1]Avidalina Cabrera etc., et al., Plaintiffs-Respondents,
v
Owen Golden, M.D. et al., Defendants-Appellants.

Defendants Owen Golden M.D. and Owen Golden M.D., P.C., appeal from the order of the Supreme Court, Bronx County (Joseph E. Capella, J.), entered on or about February 3, 2023, which, to the extent appealed from, denied their motion for summary judgment dismissing the claims for medical malpractice and wrongful death asserted against them. Defendant St. Barnabas Hospital separately appeals from the order of the same court and Justice, entered on or about February 8, 2023, which denied its motion for summary judgment dismissing the complaint as asserted against it.

Dwyer & Taglia, Valhalla (Peter R. Taglia of counsel), for Owen Golden, M.D. and Owen Golden M.D., P.C., appellants.
Schiavetti, Corgan, DiEdwards, Weinberg & Nicholson, LLP, White Plains (Samantha E. Quinn of counsel), for St. Barnabas Hospital, appellant.
Mark M. Basichas & Associates, P.C., New York (Aleksey Feygin of counsel), for respondent.

MENDEZ, J. 

Defendants appeal from orders of the Supreme Court, Bronx County, which denied their respective motions for summary judgment dismissing plaintiffs' amended complaint alleging medical malpractice and wrongful death.
For the reasons stated below, we find that regarding Owen Golden, M.D. and Owen Golden, M.D., P.C. (the Golden defendants), plaintiffs' experts' affirmations failed to controvert the opinion of the Golden defendants' expert and improperly raised new theories of liability not contained in plaintiffs' complaints or bills of particulars. Furthermore, the affirmations were not supported by the evidence, relied on hindsight, and were speculative and conclusory. Therefore, we reverse and dismiss the complaint as to these defendants. However, regarding defendant St. Barnabas Hospital, plaintiffs' experts' affirmations raised issues of fact precluding summary judgment. Therefore, we affirm the denial of summary judgment as to this defendant. Plaintiffs brought this action for medical malpractice and wrongful death against the defendants Owen Golden M.D. (decedent's primary care physician), Owen Golden, M.D., P.C., and St. Barnabas Hospital, to recover for the injuries and death of plaintiffs' decedent, Hector Cabrera. Plaintiffs allege that Dr. Golden departed from good and accepted medical treatment when on April 17, 2014, he assessed and treated decedent for a sinus infection when he should have been assessed and treated for a sentinel brain bleed, a precursor to an intracerebral hemorrhage. Plaintiffs further allege that St. Barnabas departed from good and accepted medical practice when its emergency medical staff negligently delayed the diagnosis of a brain bleed and mismanaged decedent's care by delaying treatment for an intracerebral brain hemorrhage. Plaintiffs also allege that as a result of these departures decedent sustained an intracerebral brain hemorrhage which caused his severe neurologic dysfunction, confinement to a nursing home and untimely demise.
Dr. Golden's medical records revealed that decedent [*2]came under Dr. Golden's and his associates' care in August 2007, generally for the management of his hypertension, diabetes, and hyperlipidemia. Decedent was noted to have, among other things, coronary atherosclerosis and mild obesity. He intermittently mentioned fatigue, palpitations, dizziness, dyspnea, asthma-type symptoms, and lower extremity edema. Decedent was often noncompliant with his medication. He had a syncopal episode in September 2011 and was noted to have maxillary sinusitis and acute bronchitis during a visit in February 2012.
During a visit with Dr. Golden on January 9, 2014, decedent's blood pressure was found to be well controlled (120/71). He was continued on the same medication, advised on the importance of taking his medication, and told to return in six weeks. In a follow-up visit on March 6, 2014, his blood pressure was found to be elevated (170/89). He was continued on his medications and again advised of the importance of taking them. It was noted that decedent was not compliant with his medications, and he was told to return in six weeks. On April 17, 2014, decedent appeared at Dr. Golden's office for his previously scheduled follow-up appointment.
Dr. Golden's notes document that on April 17, 2014, decedent's blood pressure was near normal (133/92), but he complained of a moderate headache (5/10 pain) and sinus pain. Decedent denied dizziness, weakness, or muscle aches. The sinus pain was over the frontal sinuses and an examination revealed "frontal sinus tender to percussion." His neck was examined and found to be "supple, no JVD" (Jugular VeinDistention). He was found to have a regular heart rate and edema in the lower extremities. As relevant, Dr. Golden assessed plaintiff to have a headache, acute ethmoidal sinusitis, and acute frontal sinusitis, in addition to his documented hypertension, diabetes, and hyperlipidemia. Decedent was prescribed Augmentin, Mucinex, Nasonex, and Montelukast, and told to return in one to two weeks.
Consistent with his notes, Dr. Golden testified that on April 17, 2014, at approximately 5:30 p.m., decedent appeared for his scheduled follow-up visit and, as relevant, complained of a little headache, sinus congestion, and sinus pain that had lasted for a couple of days. Decedent denied trauma, nausea, vomiting, dizziness, blurred vision, weakness, chest pain, or shortness of breath. He was not in acute distress and had a low-grade fever. Dr. Golden's exam again revealed frontal sinus tender to percussion, and he assessed decedent as having a sinus headache as documented in his notes.
Plaintiff Avidalina Cabrera, decedent's wife, testified that decedent woke up with a headache two or three days before his previously scheduled visit of April 17, 2014. She testified that decedent described the headache as bad, and as a different type of headache that didn't feel right. The headache stayed the same in the days leading up to his visit with Dr. Golden. The headache did not have a pounding [*3]quality and was not associated with any other symptoms such as nausea, vomiting, sensitivity to light, dizziness, or hearing loss. Ms. Cabrera was not sure but thought that decedent may have taken Tylenol for it. He stayed home from work on April 16, 2014, but was able to sleep that evening and went to work the next day.
On April 17, 2014, decedent drove himself to work, worked all day, drove himself to Dr. Golden's office for his scheduled appointment, and drove himself home that evening. On the way home from Dr. Golden's office, he called Ms. Cabrera to say he was on his way home and he still had a headache, and that Dr. Golden attributed his symptoms to seasonal allergies and had called in a prescription to the pharmacy. However, they were unable to retrieve the prescription due to the lateness of the hour.
Ms. Cabrera estimated that decedent arrived home at approximately 7:00 p.m. He ate his usual dinner, during which time Ms. Cabrera did not notice anything unusual about his demeanor. At approximately 7:30 p.m. decedent, still wearing his street clothes, laid on top of the bed but got up at approximately 8:00 p.m. to use the bathroom and returned to bed. Ms. Cabrera went to the living room to watch television. At approximately 9:00 or 9:30 p.m., she went to the bedroom to speak to decedent about what she was watching, and he responded to her conversation as he normally did. Later on, as she was returning from the kitchen, she noticed that decedent was still wearing his street clothes and had gotten out of bed again to use the bathroom. She then heard decedent stumble and ran to try to assist him, but he fell to the floor and was unresponsive. She called 911, which dispatched an ambulance that took them to St. Barnabas Hospital.
The St. Barnabas Hospital records documented that decedent was brought in by ambulance at approximately 12:30 a.m., unresponsive. At approximately 12:39 a.m. a CT scan of the brain was ordered in view of a high suspicion of a brain bleed. However, a CT scan was not performed until approximately one hour later at 1:36 a.m. and was not interpreted until 2:21 a.m., approximately two hours after decedent first presented to the emergency department.
The CT scan confirmed the diagnosis of an intracerebral brain hemorrhage caused by an aneurysmal bleed. It also confirmed moderate left maxillary sinus and mild bilateral ethmoid sinus mucosal thickening. However, the neurosurgery department did not see decedent until approximately 3:53 a.m. St. Barnabas Hospital then contacted Montefiore Medical Center to arrange for his transfer. He was transferred at 6:46 a.m. and arrived at Montefiore at approximately 6:50 a.m.
After reviewing all the relevant pleadings, medical records, and deposition transcripts, the Golden defendants' expert opinioned that Dr. Golden's treatment of decedent, including the management of his hypertension between January and April 2014 and his assessment of the headache reported during the visit on [*4]April 17, 2014, conformed to the standard of care. The expert also opined that decedent's ensuing aneurysmal bleed was not due to an elevation in his blood pressure and would have occurred even if Dr. Golden had taken the measures cited in the plaintiffs' bills of particulars — for example, referred decedent to a cardiologist given that he did not have elevated heart rate or blood pressure — nor was there a need for a referral for brain imaging study or to a neurologist or neurosurgeon because decedent did not have any of the heralding signs or symptoms of a cerebral aneurysm or an intercranial bleed. Moreover, the entire clinical picture of the headache reported on April 17, 2014 points in the direction of a benign sinus headache rather than heralding signs (red flags) of an intracerebral bleed.
The expert noted that decedent complained of a moderately severe headache (5 out of 10 on the pain scale), whereas a headache that is a heralding sign of an intracerebral bleed is almost always described as a "thunder clap headache" or "the worst headache of my life"; there was no onset of extreme pain, nausea, vomiting, double vision, eye pain, dizziness, stiff neck, or sensitivity to light; decedent's subjective complaint of sinus pain was not associated with an aneurysm; the objective findings of tenderness to percussion over the frontal sinuses and the subsequent CT scan at St. Barnabas showing moderate left maxillary sinus and mild bilateral sinus mucosal thickening are explainable by a sinus headache; decedent's headache was described by Ms. Cabrera and reported to Dr. Golden as constant, while a pending intracerebral bleed headache does not last two to four days; an intracerebral bleed headache is typically sudden, worst at the time of onset, and occurs right before the hemorrhage; decedent's activities on April 17, 2014 — driving to work, working all day, driving to Dr. Golden's office, driving home, eating his normal dinner, speaking to his wife during dinner and later during the evening with no signs of abnormality, and sleeping in the hours before the bleed — are activities entirely inconsistent with a headache due to an impending aneurysmal bleed; and decedent was not in distress and therefore there was no need to refer him to an emergency room.
Plaintiffs' experts did not controvert the Golden defendants' expert's opinion regarding the proper treatment of decedent's hypertension. In fact, their affirmations are silent on this point. They also failed to controvert the Golden defendants' expert's opinion that decedent did not exhibit the heralding signs of an aneurysmal bleed. Plaintiffs' experts state in a conclusory fashion that Dr. Golden misdiagnosed decedent with a sinus headache, but do not controvert that at the time he saw Dr. Golden, and indeed even in the days prior, he was not exhibiting any of the heralding signs of an aneurysmal bleed. Instead, they opine that because the headache lasted from two to four days decedent should have [*5]been referred to the emergency room for a CT scan. This opinion is a new theory of liability not previously raised in plaintiffs' complaints or bills of particulars.
Plaintiffs' experts misstate the record when they say that decedent went to see Dr. Golden because of the headache, in fact, the record shows he went to see Dr. Golden because he was scheduled for a follow-up visit. They also misstate the record when they say Dr. Golden prescribed Tylenol as pain medication and did not perform a proper physical exam. Dr. Golden's notes and testimony indicate that he did not prescribe any pain medication, and that he asked decedent about the headache, took his blood pressure and pulse, examined his neck, and otherwise performed an adequate exam.
Opinion evidence must be based on facts in the record. An expert cannot speculate, guess, or reach their conclusion by assuming material facts not supported by the evidence. The opinion must be supported either by facts disclosed by the evidence or by facts known to the expert personally. It is essential that the facts upon which the opinion is based be established, or fairly inferable, from the evidence (see Min Zhong v Matranga, 208 AD3d 439, 443 [1st Dept 2022], affd 39 NY3d 1053 [2023]).
Here, the Golden defendants' expert's affirmation, which is based on information contained in the relevant medical records and deposition testimony, established prima facie their entitlement to summary judgment. In opposition, plaintiffs' expert affirmations as pertain to the Golden defendants are refuted by the medical records and deposition testimony (see Connor v Gluck, 214 AD3d 448, 449 [1st Dept 2023]; Mulroe v New York Presbyt. Hosp., 203 AD3d 665, 665 [1st Dept 2022]; Echevarria v Bernstein, 200 AD3d 575, 575 [1st Dept 2021]), do not specifically controvert the opinion of defendants' expert (see Sternberg v Rugova, 162 AD3d 456, 456-457 [1st Dept 2018]), are conclusory and speculative, and fail to raise a triable issue of fact (see Weitz v Bernstein, 194 AD3d 592, 593 [1st Dept 2021]).
An expert's affirmation that sets forth general conclusions, misstatements of evidence, and unsupported assertions, and which fails to address the opinions of defendant's expert, is insufficient to defeat summary judgment (Contant v Mount Sinai Hosp., 221 AD3d 424, 424 [1st Dept 2023]; Ruiz v Rahman, 183 AD3d 491, 491 [1st Dept 2020]; Wong v Goldbaum, 23 AD3d 277, 279-280 [1st Dept 2005]). As is one which raises for the first time in opposition to summary judgment a new theory of liability that has not been set forth in the bills of particulars or in the complaint (see Vega v Kirschenbaum, 209 AD3d 458, 459 [1st Dept 2022]; Abalola v Flower Hospital, 44 AD3d 522, 522 [1st Dept 2007]). Plaintiffs' expert affirmations state for the first time in opposition to summary judgment that the Golden defendants departed from accepted practice when, after learning that decedent's headache had lasted from two to four days, Dr. Golden failed [*6]to refer him to the emergency room for a CT scan. This theory is neither in plaintiffs' complaints nor bills of particulars; is speculative, conclusory, and contradicted by the record; and should not have been considered by Supreme Court (see Ruchames v New York & Presbyt. Hosp., 176 AD3d 602, 603 [1st Dept 2019]; Concepcion v City of New York, 139 AD3d 606, 606-607 [1st Dept 2016]).
Supreme Court rejected the opinion that decedent should have been referred to the emergency room, but then denied summary judgment, accepting the opinion of plaintiffs' experts that he should have been referred for a CT scan. However, in accepting this theory, Supreme Court ignored that the only place where decedent could have had a CT scan performed, after 6:00 p.m. on the Thursday before Good Friday, was in a hospital's emergency room setting and that this theory did not appear in the complaints or the bills of particulars (see Ostrov v Rozbruch, 91 AD3d 147, 154 [1st Dept 2012]). Supreme Court also ignored, and the record reflects unequivocally, that decedent was not exhibiting any of the heralding signs of an aneurysmal bleed (Rivera v Greenstein, 79 AD3d 564, 568-569 [1st Dept 2010]).
Plaintiffs' experts opine that the absence of copious notes regarding decedent's headache in Dr. Golden's medical records is sufficient proof of an inadequate medical examination that could have led to the diagnosis of an aneurysmal bleed. However, Dr. Golden had treated decedent since 2007, was well aware of his medical history, and testified that he did ask decedent specific questions about his headache, which was not the main reason for his visit. In any event, the absence of a notation in Dr. Golden's records indicating that decedent was questioned about the headache is not proof that he was not questioned or that plaintiffs can invoke the Noseworthy doctrine, which states that a plaintiff in a wrongful death action is not held to the same degree of proof as in a personal injury action (see Noseworthy v City of New York, 298 NY 76, 80 [1948]). The Noseworthy doctrine can only be invoked where plaintiff first makes a showing of facts from which negligence can be inferred and here, in the absence of any of the heralding signs of an intracerebral bleed, and given the evidence of decedent's activities and demeanor on April 17, 2014, plaintiff has failed to provide such proof (see Melendez v Parkchester Med. Servs., P.C., 76 AD3d 927, 928 [1st Dept 2010]).
Moreover, plaintiffs' experts' opinions that "had [decedent] been referred to the emergency department by Dr. Golden for a CT scan, a diagnosis of a bleed would have been made before [decedent] collapsed at home due to the aneurysmal rupture causing the hemorrhage and same would have been repaired with most probably no residual neurologic injury" is hindsight that cannot be employed to avoid the fact that Dr. Golden was not required to investigate an otherwise unindicated condition (see Clifford v White Plains Hosp. Med. Ctr., [*7]217 AD3d 405, 405 [1st Dept 2023];Cruz v New York City Health & Hosp. Corp., 188 AD3d 592, 592-593 [1st Dept 2020]; Perez v Riverdale Family Med. Practice, P.C., 177 AD3d 554, 555 [1st Dept 2019]; Mariani v Hodjati, 148 AD3d 495, 496 [1st Dept 2017]).
With respect to St. Barnabas Hospital, plaintiff's experts opine that it departed from accepted practice in failing to immediately order and perform a head CT scan and delaying almost an hour in performing a CT scan that should have been performed within 10 minutes of decedent's arrival because time is of the essence in a situation where a brain bleed is suspected. They opine that since approximately 12:40 a.m., decedent was sufficiently stabilized and by this time the CT scan should have been ordered. Plaintiffs' experts also opine that the CT scan should have been interpreted almost simultaneously with its performance because in these situations the standard of care is to summon neurology or neurosurgery immediately. They further opine that once the diagnosis was confirmed, the medical staff at St. Barnabas Hospital mismanaged decedent by failing to commence immediate and proper treatment for the intracerebral hemorrhage. Additionally, they opine that St. Barnabas departed from the accepted standard of care when it negligently delayed the diagnosis of a brain bleed and once a diagnosis was confirmed, mismanaged decedent's care, which worsened his prognosis.
It is well settled that summary judgment should be denied where there is a disagreement between the parties' experts, assuming the expert's opinions are supported by the record (see De Jesus v Mishra, 93 AD3d 135, 138 [1st Dept 2012]). Here, there is disagreement between St. Barnabas Hospital and plaintiffs' experts. In opposition to St. Barnabas' motion plaintiffs' experts have raised issues of fact as to St. Barnabas' departures from the accepted standard of care in its treatment of decedent, including potential delays in the diagnosis and treatment of the intracerebral hemorrhage. There remain issues of fact as to whether those alleged departures contributed to decedent's diminished chance of a better outcome (see J.G. v St. Luke's-Roosevelt Hosp. Ctr., 213 AD3d 412, 412-413 [1st Dept 2023]).
Accordingly, the order of the Supreme Court, Bronx County (Joseph E. Capella, J.), entered on or about February 3, 2023, which, to the extent appealed from, denied defendants Owen Golden, M.D. and Owen Golden, M.D., P.C.'s motion for summary judgment dismissing the claims for medical malpractice and wrongful death asserted against them, should be reversed, on the law, without costs, the motion granted, and the complaint dismissed as against these defendants. The Clerk is directed to enter judgment accordingly. The order of the same court and Justice, entered on or about February 8, 2023, which denied defendant St. Barnabas Hospital's motion for summary judgment dismissing the complaint asserting claims of medical malpractice and wrongful death as against [*8]it, should be affirmed, without costs.
Order, Supreme Court, Bronx County (Joseph E. Capella, J.), entered on or about February 3, 2023, reversed, on the law, without costs, the motion granted, and the complaint dismissed as against defendants Owen Golden M.D., P.C.. The Clerk is directed to enter judgment accordingly. Order, same court and Justice, entered on or about February 8, 2023, which denied defendant St. Barnabas Hospital's motion for summary judgment dismissing the complaint asserting claims of medical malpractice and wrongful death as against it, affirmed, without costs.
Opinion by Mendez, J. All concur.
Moulton, J.P., Friedman, Gesmer, Mendez, Rodriguez, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: August 1, 2024