| Marino v New York & Presbyt. Hosp. |
| :---: |
| 2025 NY Slip Op 31655(U) |
| May 5, 2025 |
| Supreme Court, New York County |
| Docket Number: Index No. 805185/2021 |
| Judge: John J. Kelley |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:     **HON. JOHN J. KELLEY**
                                                    *Justice*

--------------------------------------------------------------------------------X

ROBERT MARINO,

                              Plaintiff,

                    - v -

THE NEW YORK AND PRESBYTERIAN HOSPITAL and
JOHN P. LEONARD, M.D.,

                              Defendants.

--------------------------------------------------------------------------------X

| | |
|---|---|
| PART | 56M |
| INDEX NO. | 805185/2021 |
| MOTION DATE | 04/25/2025 |
| MOTION SEQ. NO. | 002 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66

were read on this motion to/for                    DISMISS                    .

In this action to recover damages for medical malpractice based on alleged departures from good and accepted practice, lack of informed consent, and negligent hiring, training, supervision, and retention of health-care personnel, the defendants move pursuant to CPLR 3212 for summary judgment dismissing the complaint. The plaintiff opposes the motion. The motion is granted, and the complaint is dismissed.

The crux of the plaintiff's claim is that, between September 3, 2013 and November 15, 2019, at which time the plaintiff was a patient at Weill Cornell Hospital, a division of New York-Presbyterian/Weill Cornell Medical Center, sued herein as The New York And Presbyterian Hospital (NYPH), the defendant oncologist John P. Leonard, M.D., an NYPH employee, departed from good and accepted medical practice by failing timely to diagnose him with renal cell carcinoma, and properly to treat him for that disease. Specifically, he averred that, although the defendants properly treated him for non-Hodgkin's lymphoma, over the course of his follow-up appointments with the defendants to rule out a recurrence of that cancer, they departed from good and accepted practice by failing to perform additional positron emission tomography (PET)

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL          Page 1 of 28**
**Motion No.  002**

or computed tomography (CT) scans that would have revealed the development of renal cell carcinoma. He further asserted that the defendants failed to obtain his fully informed consent to the procedures that they did perform and to the administration of the drugs and medications that they did provide to him, and that they negligently hired, trained, supervised, and retained other health-care personnel who provided him with substandard care and treatment.

In his complaint and bills of particulars, the plaintiff alleged that the defendants departed from good and accepted medical practice by failing timely and properly to test him for ongoing or recurring lymphoma. Specifically, he alleged that they failed to act upon the progressive adverse changes and deterioration of his observable bodily and lymphatic system functions. In this respect, the plaintiff averred that they failed timely and properly to order and perform CT and PET scans, thus causing them to fail timely and properly to recognize that the plaintiff required immediate medical treatment, chemotherapy, surgical intervention, or other available treatments for cancers other than lymphoma. He also asserted that they failed timely and properly to visualize, understand, and protect his anatomic structures in and around several tumors and masses that were extant, and failed to perform a proper physical examination.

The plaintiff further asserted that the defendants failed to take and record a proper medical history, that they failed to heed or record the complaints that he made to them on October 15, 2019 that he was experiencing night sweats, weight loss, headaches, shortness of breath, and bad coughing attacks, and that they failed to address these complaints in an emergent fashion. Moreover, the plaintiff alleged that, inasmuch as he already had suffered from lymphoma, the defendants departed from good practice in failing timely and properly to recognize the need to obtain diagnostic imaging to ascertain whether it had been remediated on an emergent basis, or whether other cancers might have developed. The plaintiff additionally alleged that the defendants failed timely, properly, adequately, and accurately to prepare and maintain his hospital chart and other records. He further faulted the defendants for failing timely and properly to seek and obtain guidance and advice from other medical professionals by

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL**          **Page 2 of 28**
**Motion No.  002**

[* 2]

2 of 28

requesting further opinions from specialists who had the requisite learning, knowledge, and skill to treat him in a proper fashion.

Furthermore, the plaintiff alleged that the defendants failed timely and properly to administer appropriate and indicated medical care and treatment to him for treat renal cell carcinoma, which allegedly arose from their delay in ordering proper diagnostic testing for recurrence of lymphoma. In addition, he averred that the defendants failed properly to perform post-treatment examinations to ensure that the medical procedures that actually were undertaken were properly performed.

The plaintiff also contended that the defendants failed to disclose all reasonably foreseeable risks and benefits of the care and treatment that they ultimately rendered to him. He further asserted that they failed properly to supervise and instruct medical personnel in his treatment and care, which he claimed resulted in improper treatment at the hospital.

It is well settled that the movant on a summary judgment motion "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v New York Univ. Med. Ctr*., 64 NY2d 851, 853 [1985] [citations omitted]). The motion must be supported by evidence in admissible form (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]), as well as the pleadings and other proof such as affidavits, depositions, and written admissions (*see* CPLR 3212). The facts must be viewed in the light most favorable to the non-moving party (*see Flanders v Goodfellow,* _____NY3d_____, 2025 NY Slip Op 02261, *1 [Apr. 17, 2025]; *Vega v Restani Constr. Corp*., 18 NY3d 499, 503 [2012]). In other words, "[i]n determining whether summary judgment is appropriate, the motion court should draw all reasonable inferences in favor of the nonmoving party and should not pass on issues of credibility" (*Garcia v J.C. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept 1992]; *see Haymon v Pettit*, 9 NY3d 324, 327 n [2007]). Once the movant meets his or her burden, it is incumbent upon the non-moving party to establish the existence of material issues of fact (*see Vega v Restani Constr. Corp*., 18 NY3d

**805185/2021 MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL** **Page 3 of 28**
Motion No. 002

3 of 28

at 503). A movant's failure to make a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*see id.; Medina v Fischer Mills Condo Assn.*, 181 AD3d 448, 449 [1st Dept 2020]).

"The drastic remedy of summary judgment, which deprives a party of his [or her] day in court, should not be granted where there is any doubt as to the existence of triable issues or the issue is even 'arguable'" (*De Paris v Women's Natl. Republican Club, Inc.,* 148 AD3d 401, 403-404 [1st Dept 2017]; *see Bronx-Lebanon Hosp. Ctr. v Mount Eden Ctr*., 161 AD2d 480, 480 [1st Dept 1990]). Thus, a moving defendant does not meet his or her burden of affirmatively establishing entitlement to judgment as a matter of law merely by pointing to gaps in the plaintiff's case. He or she must affirmatively demonstrate the merit of his or her defense (*see Koulermos v A.O. Smith Water Prods*., 137 AD3d 575, 576 [1st Dept 2016]; *Katz v United Synagogue of Conservative Judaism*, 135 AD3d 458, 462 [1st Dept 2016]).

"To sustain a cause of action for medical malpractice, a plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury" (*Frye v Montefiore Med. Ctr*., 70 AD3d 15, 24 [1st Dept 2009]; *see Foster-Sturrup v Long,* 95 AD3d 726, 727 [1st Dept 2012]; *Roques v Noble*, 73 AD3d 204, 206 [1st Dept 2010]; *Elias v Bash*, 54 AD3d 354, 357 [2d Dept 2008]; *DeFilippo v New York Downtown Hosp*., 10 AD3d 521, 522 [1st Dept 2004]). Such a cause of action may be premised upon a claim that those departures allowed a patient's condition to worsen, and thus deprived him or her of an opportunity for a cure or a better outcome (*see Mortensen v Memorial Hosp*., 105 AD2d 151, 156, 159 [1st Dept 1984]; *Kallenberg v Beth Israel Hosp*., 45 AD2d 177, 178 [1st Dept 1974], *affd no op.* 37 NY2d 719 [1975]). Moreover, where a physician fails properly to diagnose a patient's condition, thus providing less than optimal treatment or delaying appropriate treatment, and the insufficiency of or delay in treatment proximately causes injury, he or she will be deemed to have departed from good and accepted medical practice (*see Perez v Fitzgerald,* 115 AD3d 177, 178 [1st Dept 2014]; *Perlin v King*, 36

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL**          Page 4 of 28
**Motion No.  002**

AD3d 495, 495 [1st Dept 2007]; *see generally Zabary v North Shore Hosp. in Plainview,* 190 AD3d 790, 795 [2d Dept 2021]; *Lewis v Rutkovsky*, 153 AD3d 450, 451 [1st Dept 2017]; *Monzon v Chiaramonte*, 140 AD3d 1126, 1128 [2d Dept 2016] ["(c)ases . . . which allege medical malpractice for failure to diagnose a condition . . .  pertain to the level or standard of care expected of a physician in the community"]; *O'Sullivan v Presbyterian Hosp. at Columbia Presbyterian Med. Ctr.*, 217 AD2d 98, 101 [1st Dept 1995]).

To make a prima facie showing of entitlement to judgment as a matter of law, a defendant physician moving for summary judgment must establish the absence of a triable issue of fact as to his or her alleged departure from accepted standards of medical practice (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]; *Barry v Lee*, 180 AD3d 103, 107 [1st Dept 2019]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24) or establish that the plaintiff was not injured by such treatment (*see Pullman v Silverman,* 28 NY3d 1060, 1063 [2016]; *McGuigan v Centereach Mgt. Group, Inc.*, 94 AD3d 955 [2d Dept 2012]; *Sharp v Weber*, 77 AD3d 812 [2d Dept 2010]; *see generally Stukas v Streiter*, 83 AD3d 18 [2d Dept 2011]).  To satisfy this burden, a defendant must present expert opinion testimony that is supported by the facts in the record, addresses the essential allegations in the complaint or the bill of particulars, and is detailed, specific, and factual in nature (*see Roques v Noble*, 73 AD3d at 206; *Joyner-Pack v Sykes*, 54 AD3d 727, 729 [2d Dept 2008]; *Koi Hou Chan v Yeung*, 66 AD3d 642 [2d Dept 2009]; *Jones v Ricciardelli*, 40 AD3d 935 [2d Dept 2007]).  If the expert's opinion is not based on facts in the record, the facts must be personally known to the expert and, in any event, the opinion of a defendant's expert should specify "in what way" the patient's treatment was proper and "elucidate the standard of care" (*Ocasio-Gary v Lawrence Hospital,* 69 AD3d 403, 404 [1st Dept 2010]).  Stated another way, the defendant's expert's opinion must "explain 'what defendant did and why'" (*id.*, quoting *Wasserman v Carella*, 307 AD2d 225, 226 [1st Dept 2003]).  Moreover, as noted, to satisfy his or her burden on a motion for summary judgment, a defendant must address and rebut specific allegations of malpractice set forth in the plaintiff's bill of particulars

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL**     **Page 5 of 28**
**Motion No.  002**

5 of 28

(*see Wall v Flushing Hosp. Med. Ctr.*, 78 AD3d 1043 [2d Dept 2010]; *Grant v Hudson Val. Hosp. Ctr.*, 55 AD3d 874 [2d Dept 2008]; *Terranova v Finklea*, 45 AD3d 572 [2d Dept 2007]).

Once satisfied by the defendant, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact by submitting an expert's affidavit or affirmation attesting to a departure from accepted medical practice and/or opining that the defendant's acts or omissions were a competent producing cause of the plaintiff's injuries (*see Roques v Noble*, 73 AD3d at 207; *Landry v Jakubowitz*, 68 AD3d 728 [2d Dept 2009]; *Luu v Paskowski*, 57 AD3d 856 [2d Dept 2008]).  Thus, to defeat a defendant's prima facie showing of entitlement to judgment as a matter of law, a plaintiff must produce expert testimony regarding specific acts of malpractice, and not just testimony that contains "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice" (*Alvarez v Prospect Hosp.,* 68 NY2d at 325 [emphasis added]; *see also Pancila v Romanzi,* 140 AD3d 516, 516 [1st Dept 2016]; *Callistro ex rel. Rivera v Bebbington*, 94 AD3d 408, 410 [1st Dept 2012], *affd sub nom. Callistro v Bebbington*, 20 NY3d 945 [2012]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24).  In most instances, the opinion of a qualified expert that the plaintiff's injuries resulted from a deviation from relevant industry or medical standards is sufficient to preclude an award of summary judgment in a defendant's favor (*see Murphy v Conner*, 84 NY2d 969, 972 [1994]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24).

As relevant to the instant action, "'the failure to investigate a condition that would have led to an incidental discovery of an unindicated condition does not constitute malpractice'" (*Rotante v New York Presbyterian Hospital-New York Weill Cornell Med. Ctr.*, 175 AD3d 1142, 1144 [1st Dept 2019]; quoting *David v Hutchinson*, 114 AD3d 412, 413 [1st Dept 2014]).

In *David*, the plaintiff's decedent successfully was treated for two large liver abscesses and right pleural effusion.  Approximately one year after those conditions had resolved, the decedent developed a series of complications, leading to repeated hospitalizations and nursing home stays, as well as an antibiotic-resistant infection secondary to decubitus ulcers, which

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL       Page 6 of 28**
**Motion No.  002**

6 of 28

[* 6]

ultimately caused her death. The defendants' expert opined that, during that one year, there were no indicia or symptoms of recurring liver abscesses or right pleural effusion and, hence, no reason to undertake additional imaging studies. The plaintiff's expert countered with an opinion that "testing for a post-operative infection would have led to the discovery of [new] abscesses" (*David v Hutchinson*, 114 AD3d at 413). The Appellate Division, First Department, concluded that the opinion of the plaintiff's expert was insufficient to raise a triable issue of fact because the expert did not "identify any basis to suspect the presence of liver abscesses" (*id*.), but simply faulted the defendants for failing to investigate conditions that already had resolved because such an investigation *might* have led to the incidental discovery of an unindicated condition.

In *Rotante*, the plaintiff's decedent presented to the defendant hospital's emergency department with certain complaints, but did not complain of fever, shortness of breath while sitting, or chest pains, and there was no indication that he suffered from bacteremia. The decedent died of cardiac arrest shortly after admission. The First Department rejected, as insufficient, the opinion of the plaintiff's expert that, had the defendant tested the decedent for bacteremia, diagnosed it, and treated it, the decedent's chance of survival would have increased to 30%. That Court concluded that the plaintiff's expert's opinion impermissibly was premised upon the hospital's failure to test for a non-indicated condition that incidentally could have been discovered had they tested for it. In *Clifford v White Plains Hosp. Med. Ctr.* (217 AD3d 405, 405 [1st Dept 2023]), the First Department explained that,

> "[t]he assertion that an emergency lumbar spine MRI was required in the face of plaintiff's low back pain and that the negative results of that exam would have led the doctors to further testing including a cervical MRI and blood work, thus diagnosing the cervical abscess, is hindsight that cannot be employed to avoid the fact that defendants were not required to investigate an otherwise unindicated condition"

(*see Curry v Dr. Elena Vezza Physician, P.C.*, 106 AD3d 413, 413-414 [1st Dept 2013] [awarding summary judgment to defendant physician where plaintiff's expert essentially opined that defendant physician was "guilty of failing to discover [a] cancer by accident"]; *Limmer v*

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL          Page 7 of 28**
**Motion No.  002**

*Rosenfeld*, 92 AD3d 609, 609-610 [1st Dept 2012] [plaintiff's expert failed to address the conclusion of defendants' experts that plaintiff exhibited no symptoms that should have caused the defendant physician to suspect osteomyelitis]; *Rivera v Greenstein*, 79 AD3d 564, 568 [1st Dept 2010] [when the defendant physician examined the patient, "clinical and laboratory findings one would expect to see in myocarditis, such as fluid in the lungs, were not present," and the "conclusory assertions and mere speculation" of the plaintiff's expert "that a doctor could have discovered the condition and successfully treated the patient does not support liability"]).

In addition, the promulgation of guidelines by a recognized medical society or medical study organization does not, standing alone, establish a standard of care in the profession, unless those guidelines become requirements, or actually have been adopted in practice by the profession, or a particular specialty or sub-specialty in that profession (*see Diaz v N.Y. Downtown Hosp*., 99 NY2d 542, 544-545 [2002]; *Halls v Kiyici*, 104 AD3d 502, 504 [1st Dept 2013]; *cf. Spensieri v Lasky*, 94 NY2d 231, 239 [1999] [Physicians' Desk Reference, a compilation of pharmaceuticals, their indications, contraindications, dosages, and reactions, does not by itself establish a standard of care within the medical profession]).

In support of their motion, the defendants submitted the pleadings, the plaintiff's bills of particulars, transcripts of the parties' deposition testimony, relevant medical and surgical records, the note of issue, a statement of allegedly undisputed material facts, a memorandum of law, an attorney's affirmation, and the expert affirmation of board-certified internist and oncologist Robert Soiffer, M.D.  Dr. Soiffer opined that the defendants did not depart from good and accepted medical practice in their examinations, diagnoses, and treatment of the plaintiff, and that nothing that they did or did not do caused or contributed to the development of cancer or an outcome less favorable than the plaintiff might have wished.

According to Dr. Soiffer's interpretation of the plaintiff's medical records, on August 19, 2013, secondary to complaints of abdominal pain, the plaintiff underwent an exploratory laparotomy and small bowel resection at Englewood Hospital in Englewood, New Jersey, which

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL          Page 8 of 28**
**Motion No.  002**

8 of 28

revealed the existence of a small bowel tumor. The bowel was resected, and the plaintiff was diagnosed with diffuse large B-cell lymphoma (DLBCL) of the small intestine. The NYPH pathology laboratory re-reviewed specimens from the resection, confirming that the plaintiff suffered from DLBCL of the small intestine, but that there was no evidence of disease in the lymph nodes themselves. On September 3, 2013, the plaintiff first presented to Leonard, who specialized in the diagnosis and treatment of lymphoma, complaining of fatigue, anorexia, night sweats, and occasional constipation, albeit with improvement in bowel symptoms since the resection procedure. As Dr. Soiffer explained it, on that date, Leonard extracted a bone marrow aspirate sample for biopsy, performed the biopsy, and diagnosed the plaintiff with one-sided extranodal diffuse large B-cell lymphoma, that is, lymphoma that occurred outside of the lymph nodes themselves. Dr. Soiffer further reported that, on September 12, 2013, the defendants performed PET/CT imaging, employing the radioactive tracer fluorodeoxyglucose (FDG), scanning from the base of the plaintiff's skull to his thigh, and noted that the plaintiff's medical records indicated that there was FDG uptake along the surgical sutures that corresponded to mild circumferential wall thickening, caused either by postsurgical changes or recurrence of the lymphoma. Nonetheless, Dr. Soiffer explained that there was no evidence of "FDG avid or enlarged lymph nodes" throughout the remainder of the study.

The plaintiff returned to see Leonard on September 17, 2013. Dr. Soiffer asserted that, at that time, Leonard recommended the administration of between four to six "cycles" of chemotherapy, consisting of rituximab, cyclophosphamide, doxorubicin, vincristine, and prednisolone (known as "R-CHOP" therapy), to which the plaintiff consented, after which the plaintiff underwent six cycles between September 24, 2013 and January 7, 2014, which Dr. Soiffer characterized as "standard." He further opined that the toxicities of R-CHOP included possible development of cytopenia, infection, fertility issues, fatigue, infusion reactions, nausea, alopecia, cardio toxicity, neuropathy, steroid toxicity, extravasation, and other risks, some of which could be life threatening. According to Dr. Soiffer, during this interval, the plaintiff asserted

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL          Page 9 of 28**
**Motion No.  002**

9 of 28

that he was experiencing fatigue, nausea, intermittent pain, muscle aches, hair loss, headaches, night sweats, night chills, tingling of his lips, urinary symptoms, decreased appetite, and loss of sense of taste, which Dr. Soiffer characterized as "not unexpected." He further asserted that, aside from fatigue, neuropathy, and headaches, with respect to which the plaintiff had a prior history, the records reflected these side effects ultimately resolved.

On February 19, 2014, the plaintiff underwent a PET/CT scan, which Dr. Soiffer concluded had indicated no presence of cancer, as it did not reflect the presence of FGD avid neoplasm. In particular, he noted that the records evidenced no focal hypermetabolic activity in the region of the small bowl anastomosis in the right lower quadrant, nor any enlarged or hypermetabolic lymph nodes in the abdomen or pelvis. The plaintiff returned to see Leonard on February 27, 2014, and reported that he was returning to his baseline condition, albeit with mild neuropathy in his feet. At that visit, the plaintiff weighed 191 pounds. Leonard reported at that visit that the February 19, 2014 PET scan showed no evidence of disease. Leonard also reviewed the plaintiff's complete blood count (CBC) testing, and directed the plaintiff to return in four months, or sooner if needed.

On June 26, 2014, the plaintiff returned to Leonard, reporting mild fatigue, which the medical records described as "manageable," as well as neuropathy in his hands and feet, which the records reported was "much improved." At that time, he weighed 190 pounds, and his CBC test was described as stable. Leonard purportedly formulated a plan to monitor the plaintiff closely, and directed the plaintiff to return in four months and to follow up with his primary care physician as needed. On October 2, 2014, the plaintiff again returned to Leonard for a follow-up appointment, reporting fatigue, difficulty sleeping, and intermittent episodes of waking up at night, with difficulty breathing and palpitations, although he allegedly reported that the neuropathy in his hands and feet had improved. The plaintiff weighed 193 pounds at that time. Leonard concluded that the plaintiff's fatigue was likely related to insomnia, and that the etiology of palpitations and shortness of breath was unclear, but less likely related to chemotherapy than

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL**          **Page 10 of 28**
  **Motion No.  002**

10 of 28

to other causes. Leonard planned to conduct an electrocardiogram study that day, and he recommended that the plaintiff both follow up with his primary care physician and return to see Leonard within another four months.

Dr. Soiffer asserted that, on February 10, 2015 and September 10, 2015, the plaintiff met with Leonard, complaining of fatigue, difficulty sleeping, night sweats, neuropathy, and migraines at his first 2015 appointment, and diffuse symptoms, fatigue/low energy, general weakness, mild/improved neuropathy, and occasional dyspnea on exertion at the second. While the plaintiff's weight decreased from 201 to 183 pounds between the two visits, his CBC testing remained stable, and, according to Dr. Soiffer, he was otherwise stable from a lymphoma perspective. The plaintiff's records reflected that Leonard assessed him as having chronic and non-specific findings, with no evidence of a relapse of lymphoma or new or worsened toxicity. The plaintiff apparently was being monitored by a neurologist, and Dr. Soiffer asserted that Leonard advised the plaintiff that he also should follow up with his primary care physician, consider undergoing an echocardiogram, and return in four months.

As Dr. Soiffer interpreted the plaintiff's medical records, on September 18, 2015, the plaintiff met with his longstanding primary care physician, internist Russell S. Gura, who reported that the plaintiff was cancer free, but was experiencing myalgias, bone pain, weakness, shortness of breath, and migraines. According to Dr. Gura's records, physical therapy provided the plaintiff with some relief, but he continued to experience weakness, myalgias, and lack of stamina, and weighed 187 pounds, which represented a decrease of 12 pounds since his previous examination. Dr. Gura suspected that deconditioning and depression were the cause of these conditions, and recommended exercise. On January 29, 2016, Dr. Gura prescribed the antibiotic Cipro to treat the plaintiff for a urinary tract infection. As of that date, the plaintiff weighed 186 pounds. When he returned to see Dr. Gura on July 18, 2016, he weighed 176.2 pounds, and complained of stomach problems, a possible urinary tract infection, and mild back tenderness, but denied having experienced nausea, vomiting, fevers, or any bloody discharge

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL       Page 11 of 28**
**Motion No.  002**

from his rectum. Dr. Gura reported that the results of a physical examination were unremarkable, and wrote that the plaintiff's stomach bloating could have been from the prior cancer in his gastrointestinal tract, as well as from the bowel resection surgery.

Dr. Soiffer asserted that the plaintiff's medical records further indicated that, on July 18, 2017, the plaintiff presented to neurologist Jeorg-Patrick Stuebgen, M.D., for the management of ongoing headaches. According to Dr. Stuebgen's records, the plaintiff reported experiencing increased frequency of headaches and severe stress from an allegedly "messy breakup" with his life/professional partner, and he was waking up at night with what he characterized as "anxiety attacks." Dr. Stuebgen's records further reported that the plaintiff was seeing a psychotherapist, but not taking medication. According to Dr. Stuebgen, the plaintiff's neurological examination was normal, and he discussed with the plaintiff methods for reducing stress and avoiding stressors. Dr. Stuebgen re-prescribed Topiramate for migraine headaches.

On July 19, 2017, the plaintiff returned to see Dr. Gura, and complained of having experienced post-nasal drip and ear/sinus congestion for several months prior thereto. As relevant here, Dr. Gura's records indicated that the plaintiff had complained of waking with heart palpitations and tingling in his fingertips, as well as of suffering from erectile dysfunction. Moreover, by this time, the plaintiff weighed 164.5 pounds, a reduction of 11.7 pounds since his previous visit with Dr. Gura. Nonetheless, Dr. Gura reported that the results of a physical examination were within normal limits, and recommended that the plaintiff take medications for nasal congestion, erectile dysfunction, and anxiety.

On August 1, 2017, or approximately two years after his most recent visit with Leonard, the plaintiff returned to see Leonard, and allegedly reported that he was doing "ok," with some fatigue and intermittent bowel issues. At this visit, the plaintiff weighed 164 pounds. Leonard reported that the plaintiff generally was stable, with no lymphoma-related symptoms. Leonard reviewed results of CBC testing, and advised the plaintiff to follow up with Dr. Gura to discuss those results. According to Dr. Soiffer, the results of that testing revealed "elevated neutrophils

805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL        Page 12 of 28
Motion No. 002

12 of 28

(78.4, range 45-75) and absolute neutrophils (8.7, range 1.8-7.0) and low lymphocytes (16.8, range 20-50). The plaintiff's ALT [aminotransferase enzyme] level was low, but hemoglobin, hematocrit, lactate dehydrogenase, . . . and albumin were within normal limits." Leonard reported that there was no evidence of relapse, new toxicity, or worsened toxicity, and instructed the plaintiff to follow up with him in six months or sooner. The plaintiff then saw Dr. Gura on October 13, 2017, at which time he weighed 163 pounds, and complained of erectile dysfunction, as well as anxiety and stress from working with his former partner. He again saw Dr. Gura on November 1, 2017 to express concerns about two lesions that he had observed on his genitals, which Dr. Gura thought to be benign.

On May 7, 2018, the plaintiff returned to Dr. Gura, at which time he weighed 173 pounds, a 10-pound gain, although he was diagnosed with a viral upper respiratory illness. On September 7, 2018, the plaintiff returned to Dr. Gura, at which time he weighed 172 pounds. As relevant here, the plaintiff complained of lower back pain and a burning sensation in his urethra. Dr. Gura reported that an examination was significant for mild bilateral costovertebral angle, while a urinalysis was negative, and a urine culture showed no growth of any organisms. Dr. Gura recommended that the plaintiff meet with a urologist if symptoms persisted.

On February 6, 2019, the plaintiff returned to see Dr. Stuebgen, complaining of a sensory change to his feet and lower legs and "cluster migraine" patterns, with headaches triggered by stress. Dr. Stuebgen re-prescribed Topiramate to treat the plaintiff's migraines. The plaintiff then saw Dr. Gura on September 25, 2019, at which time he weighed 160 pounds. Dr. Gura diagnosed him with rhinosinusitis. The plaintiff next saw Dr. Stuebgen on October 3, 2019, at which appointment he complained of a squeezing sensation of the forearms and hands that was affecting his sleep. Dr. Stuebgen concluded that the results of a neurologic examination were within normal limits, and wrote that the "stocking/glove distribution" of the conditions described by the plaintiff suggested possible chemotherapy-induced neuropathy,

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL**          **Page 13 of 28**
**Motion No.  002**

13 of 28

although he did not deem any further neurological investigations to be necessary. According to the relevant medical chart, Dr. Stuebgen discussed treatment of the symptoms with the plaintiff.

On October 15, 2019, or more than two years after his most recent visit with Leonard, the plaintiff once again returned to see Leonard, and complained of fatigue, ongoing numbness, and "stable" shortness of breath on exertion, for which he requested a referral to a cardiologist. The plaintiff denied having recently experienced a fever or night sweats. A physical examination reflected that the plaintiff weighed 162 pounds at that time, and Leonard concluded that both this examination and laboratory blood tests on samples drawn that day were unremarkable, except for a low ALT reading. Leonard wrote that the plaintiff was otherwise generally stable, and had no lymphoma-related symptoms. According to Leonard's records, he planned to refer the plaintiff for a transthoracic echocardiogram, and did refer the plaintiff to a cardiologist to assess ongoing dyspnea on exertion. Leonard purportedly recommended that the plaintiff continue treating with Drs. Gura and Stuebgen, as well as that cardiologist, and to return to see Leonard annually, or sooner if needed. Soon thereafter, the plaintiff saw cardiologist Rebecca R. Ascunce, M.D., who checked his thyroid and told him that it was fine.

On January 13, 2020, the plaintiff again saw Dr. Gura, at which time his weight had decreased to 155 pounds. He complained to Dr. Gura of having experienced night sweats for several months, weight loss despite eating normally, and fatigue. Nonetheless, Dr. Gura's review of the plaintiff's symptoms resulted in positive findings for diaphoresis, malaise, fatigue, weight loss, and abdominal pain, and he concluded that the physical examination was positive for abdominal tenderness. Dr. Gura thus referred him to Hematology Oncology Physicians of Englewood, P.A. (HOPE), located in Englewood, New Jersey, for evaluation. On January 31, 2020, the plaintiff presented to health-care practitioners HOPE, reporting a chronically poor appetite, a weight loss of 25 pounds since January 2019, night sweats since summer 2019, and some difficulty swallowing. He asserted that, since autumn 2019, he had seen several doctors who had not discovered the etiology of his symptoms. The practitioners at HOPE formulated a

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL**          **Page 14 of 28**
**Motion No.  002**

14 of 28

plan to obtain a PET/CT scan, which they took on February 3, 2020. According to HOPE's chart, that scan revealed evidence supportive of renal malignancy and metastatic disease, while a CT guided biopsy that they performed on February 11, 2020 revealed the presence of stage IV high grade renal cell carcinoma. As Dr. Soiffer interpreted HOPE's voluminous records, over the course of the plaintiff's treatment there between 2020 and 2023, HOPE personnel never reported that the plaintiff had suffered from a recurrence of lymphoma.

As Dr. Soiffer characterized the plaintiff's contentions, the gist of the plaintiff's claim was not that Leonard was negligent in failing to diagnose or treat recurrent lymphoma, but that Leonard's alleged failure to monitor for recurrent lymphoma with additional PET scans, CT scans, or "all clear" scans,[1] "may have incidentally resulted in a diagnosis of a second cancer, specifically renal cell carcinoma," six years after the plaintiff had been cured of lymphoma. He rejected such a contention as a ground for holding Leonard liable for malpractice. Dr. Soiffer opined that the medical treatment that the defendants provided to the plaintiff was at all times consistent with the standard of care in effect in 2014 through October 2019, inasmuch as the administration of six cycles of R-CHOP to treat plaintiff's intestinal DLBC-type lymphoma was appropriate treatment and within the standard of care, particularly because the R-CHOP regimen successfully cured the lymphoma, which has never recurred. As he explained it, the standard of care with respect to diagnostic imaging requirements

> "includes PET/CT scans before the commencement of R-CHOP to assess the disease/extent of disease and following the completion of R-CHOP to assess if the disease persists. There is not an agreed upon standard of care for serial surveillance imaging thereafter absent signs or symptoms of recurrent disease. . . . [T]he Defendants complied with the standard of care in having Plaintiff undergo PET/CT imaging before commencing R-CHOP and again after six cycles of R-CHOP had been completed. . . . [S]ubsequent surveillance imaging was not warranted as the report from the PET/CT scan from February 2014 showed no evidence of disease, and plaintiff's complaints, assessments and laboratory results at the various visits thereafter were not indicative of recurrent lymphoma, the condition that Dr. Leonard was monitoring. . . . Leonard

---

[1] Dr. Soiffer explained that the plaintiff's references to "all clear" imaging in his complaint and bills of particulars do not advert to recognized medical terminology, but appear to describe PET scans.

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL      Page 15 of 28**
**Motion No.  002**

15 of 28

appropriately monitored plaintiff at follow-up office visits following completion of R-CHOP and appropriately directed him to follow-up with his P[rimary] M[edical] D[octor] and other specialists. . . . Leonard was not responsible for monitoring and assessing for any and all kinds of cancer in existence but rather had a duty related to the management, treatment and monitoring of lymphoma and recurrent lymphoma. Notwithstanding, during the time that Dr. Leonard was monitoring plaintiff for recurrent lymphoma, . . . there were no signs or symptoms of RCC."

Dr. Soiffer further concluded that Leonard's determination to forego taking additional PET or CT scans subsequent to February 19, 2014 did not cause or contribute to the advent or exacerbation of renal cell carcinoma.[2]

As Dr. Soiffer more particularly explained it, R-CHOP was the most effective treatment for DLBCL in 2013 and 2014, and the number of cycles of administration to be recommended was based on the extent and stage of the disease and location, although other factors, such as patient health and comorbidities, should also have been considered. He noted that the plaintiff here had stage-1E DLBCL that had been fully resected, but that, since his lymphoma involved the small bowel, a "concerning location that can signal aggressiveness of the disease," the administration of six cycles was within the standard of care to best ensure eradication of the disease. In this respect, he noted that, after the plaintiff completed the regimen of R-CHOP therapy, PET/CT scan imaging from February 2014 confirmed no evidence of the disease, and that the plaintiff "has never suffered a recurrence of lymphoma, now approximately 10 years following the completion of treatment." Dr. Soiffer thus opined that the treatment that the defendants rendered to the plaintiff not only was within the applicable standard of care, but actually cured the plaintiff of the disease for which he sought treatment.

Dr. Soiffer expressly opined that the defendants' monitoring of the plaintiff after the completion of R-CHOP therapy was at all times within the standard of good and accepted

---

[2] Dr. Soiffer pointed out that the plaintiff did not assert, either in his complaint or in his bill of particulars, that Leonard departed from good and accepted practice in diagnosing him with lymphoma in September 2013, treating him for lymphoma between September 2013 and January 2014, or undertaking diagnostic testing up to and including February 19, 2014, the date of Leonard's last PET scan. Hence, Dr. Soiffer argued that, to the extent that any claims were premised on acts or omissions antedating February 19, 2014, those claims should be dismissed.

**805185/2021 MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL Page 16 of 28**
**Motion No. 002**

medical practice that existed between February 2014 and October 2019. He noted that the plaintiff completed R-CHOP therapy on January 7, 2014, and that, contrary to the plaintiff's contention, he underwent at least one PET/CT scan of his body, from the base of the skull to the thigh, which was taken on February 19, 2014. Dr. Soiffer stated that Leonard discussed the results of the scan with the plaintiff on February 27, 2014, and that Leonard informed the plaintiff that there was no evidence of disease. Moreover, contrary to the contentions set forth in the complaint and the plaintiff's bills of particulars, Dr. Soiffer explained that the plaintiff was, in fact, referred for a PET/CT scan both prior to commencing R-CHOP therapy and after completing R-CHOP therapy. He characterized PET/CT as an imaging modality consistent with the standard of care imaging for assessing DLBCL. Dr. Soiffer asserted that

> "[t]he CT portion of the study helps to identify anatomical sizing and location. PET imaging uses radioactive pharmaceutical to reveal metabolic or biochemical function of the tissues and organs. As cancer cells (and sometimes infection and inflammation) have a higher metabolic rate than typical cells, they will appear brighter on PET imaging. PET/CT is used to identify enlarged lymph nodes and whether they appear bright, indicating increased metabolic activity. Thus, it is my opinion, within a reasonable degree of medical certainty, that the PET/CT imaging performed before and after the completion of R-CHOP was appropriate imaging and within the standard of care."

Although Dr. Soiffer characterized the plaintiff's allegations as "vague," he averred that it was his understanding that the plaintiff was claiming that the defendants were negligent in failing to perform serial surveillance imaging in the months and years following completion of R-CHOP therapy and the February 19, 2014 PET/CT scan. He opined, however, that "there was no standard of care requiring surveillance imaging after treatment of DLBCL when post-treatment imaging showed no evidence of the disease and the patient did not present with signs and symptoms of recurrent disease."

Although Dr. Soiffer acknowledged that many studies had been performed and a variety of literature and guidelines had been published regarding the usefulness of surveillance imaging following successful treatment of DLBCL, there was no "general consensus" as to whether

805185/2021 MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL Page 17 of 28
Motion No. 002

17 of 28

surveillance imaging should or should not be performed in the scenario presented by the plaintiff.  As he explained, it,

> "[s]ome studies and literature over the years have cited several reasons against performing surveillance imaging following remission of DLBCL, including a lack of evidence that the imaging detects recurrences prior to clinical signs and symptoms, lack of support of improved survival rates, high false positive rates, cumulative risk of radiation-induced malignancy, and considerations of decreased likelihood of relapse."

Dr. Soiffer rejected the plaintiff's contention that surveillance imaging was required by the National Comprehensive Cancer Network (NCCN), and concluded that the NCCN statement with respect to this issue was a *guideline* that may be considered by a practitioner, but did not dictate the standard of care.  Since he concluded that there was no agreed-upon standard of care requiring surveillance imaging following remission of DLBCL, he opined that there was no requirement that the defendant refer the plaintiff for further imaging following the February 19, 2014 PET/CT scan, even for the limited purpose of monitoring for a recurrence of DLBCL.

Dr. Soiffer thus concluded that the defendants provided the plaintiff with proper clinical monitoring.  In this respect, he averred that, following remission from DLBCL, patients are typically seen approximately every four months for follow-up appointments, which include physical assessments and laboratory work, with decreased frequency beginning two years after remission.  He asserted that some patients will continue to present annually and some patients will cease follow-ups altogether.  Since the plaintiff was found to be in remission as of February 19, 2014, when PET/CT imaging was negative for lymphoma, and was instructed to return in four months following his February 27, 2014 visit with Leonard, Dr. Soiffer concluded that the post-remission monitoring was within the standard of care.  He noted, particularly, that Leonard did, in fact, see the plaintiff on numerous occasions between February 27, 2014 and October 15, 2019, that the intervals that Leonard recommended for the follow-up appointments were within the standard of care, and that the plaintiff never developed recurrent lymphoma, "the only

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL**          **Page 18 of 28**
  **Motion No.  002**

18 of 28

reason he was continuing to present to Defendants." He further asserted that the plaintiff was properly evaluated at each follow-up visit.

Dr. Soiffer averred that Leonard was obligated, during these follow-up appointment, to investigate whether the plaintiff evidenced the most common signs and symptoms of recurrent lymphoma, which include swollen lymph nodes, swelling in the body, and other clinical signs, including, but not limited to, fatigue, weight loss, fever, and night sweats, as well as abnormal laboratory results, specifically low levels of hemoglobin, hematocrit, lactate dehydrogenase, and/or albumin, which can be indicative of a systemic illness. Nonetheless, he noted that, following R-CHOP therapy, the plaintiff never presented swollen lymph nodes or swelling in the body, nor any abnormal laboratory results that would be concerning for recurrent lymphoma. With respect to the other clinical symptoms that Dr. Soiffer enumerated, he explained that, given that they were non-specific in nature, very common, and often attributable to other non-cancer-related causes, these signs, standing alone, would not raise a suspicion for recurrent lymphoma. Upon his review of the parties' deposition testimony and the records pertaining to the follow-up office visits that the plaintiff had with Leonard on six occasions subsequent to February 27, 2014, Dr. Soiffer opined that there was nothing suggestive of recurrent lymphoma. He asserted that most of the laboratory results were within normal range, and that, although the August 1, 2017 laboratory results were slightly out of range for neutrophils, lymphocytes, and ALT, none was indicative of recurrent lymphoma. Dr. Soiffer further asserted that the complaints that the plaintiff made to Leonard during these visits, including those referable to fatigue and weight loss, were not concerning for recurrent lymphoma, particularly because of the unremarkable physical exams and laboratory results.

With respect to the plaintiff's contention that additional PET or CT scans between February 2014 and October 2019 might have revealed the development of renal cell carcinoma, Dr. Soiffer asserted that different cancers have different signs and symptoms, that not all cancers are treated by every oncologist, and that Leonard primarily specialized in lymphoma,

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL      Page 19 of 28**
**Motion No.  002**

while nothing in the records suggested that he had familiarity with the diagnosis and treatment of renal cell carcinoma. Crucially, Dr. Soiffer opined that "[t]here is no known confirmed correlation or known increased likelihood of developing RCC following lymphoma nor do the records from HOPE suggest any correlation between the two cancers for Plaintiff." As he explained it,

> "kidney cancers are often not diagnosed in early stages due to lack of symptoms and the general nature of associated symptoms. For instance, hematuria, low back pain on one side, mass/lump on the side or lower back, anemia, and persistent fever not caused by infection are some of the symptoms that can be associated with kidney cancers. There are some other clinical signs but very general in nature and without more, would not raise a suspicion. . . . Plaintiff did not present to Dr. Leonard with signs and symptoms suspicious for RCC."

Dr. Soiffer characterized the plaintiff's contentions as vaguely alleging that Leonard failed to manage and re-assess risk level or anticipate risks, concluding that the plaintiff's risk of developing recurrent lymphoma was very low, that such recurrence did not eventuate in any event, and that the plaintiff "was not at any known increased risk of developing a second cancer." Hence, he concluded that the defendants' monitoring of the plaintiff conformed to the standard of care. Dr. Soiffer noted that Leonard repeatedly referred the plaintiff to follow up with Dr. Gura with respect to his non-specific complaints and for the abnormal CBC results that were reported at his August 1, 2017 appointment with Leonard, and concluded that Leonard timely and properly referred the plaintiff for further a work-up to assess the etiology of those complaints and laboratory results. Moreover, although the plaintiff claimed that he repeatedly requested that Leonard perform post R-CHOP surveillance scans, Dr. Soiffer concluded that Leonard was not required to oblige such a request where, as here, the standard of care did not require it, and where, as here, Leonard did not agree with that approach. As Dr. Soiffer explained it, if the plaintiff was unhappy with Leonard's conclusion in this regard, he could have sought a second opinion or made the request to another physician such as Dr. Gura.

Dr. Soiffer expressly rejected the plaintiff's contention that the defendants failed to obtain a thorough history or maintain appropriate medical records, instead concluding that the

**805185/2021 MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL**     **Page 20 of 28**
**Motion No. 002**

20 of 28

defendants' medical records contained a very thorough history, including pertinent care and treatment rendered at Englewood Hospital, and that there was no medical history of any significance that was omitted from those records. He further rejected the plaintiff's claim that Leonard and other hospital personnel were not properly trained with respect to the signs, symptoms, treatment, and potential for stage IV renal cell carcinoma, that none of the depositions or medical records evinced a failure properly to train Leonard or such personnel, and that Leonard's credentials and training, including continuing medical education, established that he was fully and properly educated and experienced.

In addition, Dr. Soiffer asserted that the plaintiff's expert witness disclosure statement (CPLR 3101[d]) included additional claims of alleged departures from good medical practice that the plaintiff had not previously alleged in his complaint and bills of particulars, such as allegations that CT scans with contrast should have been performed every six months for two years subsequent to the February 19, 2014 PET scan. Dr. Soiffer opined that a PET/CT scan is the preferable imaging study for assessment of recurrent lymphoma, as it is more accurate than a CT scan alone, although he conceded that taking CT scans with contrast nonetheless would have been within the standard of care. He asserted that, since Leonard ordered PET/CT scans, and two of those scans were performed, "there is no basis or foundation for assuming that the imaging modality would have been changed. There is also no need to have switched from ordering PET/CT to CT scans with contrast as PET/CT scan is the more accurate modality." Dr. Soiffer further explicitly rejected the assertion in the plaintiff's CPLR 3101(d) statement that that renal cell carcinoma would have been detectable, diagnosable, and treatable by January 2016, or at the latest, by summer 2017. He noted that the plaintiff did not appear for any appointments with Leonard in 2016 and, hence, that there was no manner in which the defendants could have detected renal cell carcinoma in January 2016. Moreover, Dr. Soiffer noted that the plaintiff presented to Leonard on August 1, 2017, which was more than two years since the completion of the R-CHOP therapy and, therefore, beyond the two-year period of

805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL          Page 21 of 28
Motion No. 002

21 of 28

serial surveillance imaging that the plaintiff's expert himself suggested in the CPLR 3101(d) statement. He asserted that,

> "[t]he only reason to perform imaging at this point would have been secondary to a suspicion of recurrent lymphoma, which there was none at this time as opined above, and plaintiff was properly referred to his PMD. Moreover, it is complete speculation to assume that RCC would be incidentally present and diagnosable had Dr. Leonard ordered imaging for evaluation for recurrence of lymphoma."

Dr. Soiffer also preemptively stated that the plaintiff's oncology expert would not be able to conclude that the plaintiff's renal cell carcinoma incidentally would or could have been detectable, diagnosable, or treatable by either January 2016 or summer 2017, since cancers grow at different rates, which can vary at different times.

Dr. Soiffer also criticized the plaintiff for including, in his pleadings, allegations referable to a November 15, 2019 total hip arthroplasty, including references to preoperative assessments, equipment used in that procedure, and the risk of that procedure, none of which is germane to the treatment rendered by the defendants to the plaintiff in connection with lymphoma, let alone an alleged failure to diagnose renal cell carcinoma. In fact, at his deposition, the plaintiff explicitly denied ever having undergone such a procedure.

In opposition to the defendants' motion, the plaintiff relied on the same documentation that the defendants had submitted. He also submitted an attorney's affirmation and the expert affirmation of oncologist Aymen Elfiky, M.D., MPH, MSc. Dr. Elfiky asserted that the standard of care for post-chemotherapy surveillance of patients diagnosed with DLBCL

> "entails interval clinic follow up with physical exam and labs every 3-6 months for 5 years and then yearly or as clinically indicated. In addition, imaging with CT scan of chest, abdomen, and pelvis every 6 months *for 2 years after completion of treatment*, then as clinically indicated"

(emphasis added). Although Dr. Elfiky noted that Leonard performed a PET/CT in February 2014, which was after the plaintiff's R-CHOP treatment course had been completed, no further imaging was discussed or scheduled by Leonard over the course of the ensuing five years, that

805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL          Page 22 of 28
Motion No.  002

22 of 28

is, through October 15, 2019, which Dr. Elfiky characterized as a departure from the established standard of care. He stated that, although the plaintiff had continued

> "to contend with post-treatment complaints, no consideration was given to re-imaging despite the fact that labs were unrevealing. The fact that Mr. Marino went on to develop more pronounced signs and symptoms of weight loss and night sweats highlights Dr. Leonard's negligence in acknowledging complaints that are pathognomonic for malignancy in a patient with a history of an aggressive cancer. Moreover, as these signs/symptoms are reflective of an advanced malignancy, it can be stated confidently that Mr. Marino's large RCC had been developing over the years beforehand. As such, had Dr. Leonard been obtaining standard of care surveillance CTs to follow up lymphoma, Mr. Marino's RCC would have been detected at an earlier state why localized to the kidney, and therefore curable by surgical resection."

Instead, according to Dr. Elfiky, renal cell carcinoma continued to develop over the years until it metastasized, thereby becoming incurable. Moreover, although Dr. Elfiky noted that DLBCL is a curable malignancy, with additional options for patients that recur after initial chemotherapy, and that the plaintiff was, in fact, in remission with respect to DLBCL, he nonetheless concluded that, "beyond Dr. Leonard's failure to obtain surveillance scans, he again demonstrated overt negligence by failing to work up Mr. Marino's clinically worrisome signs and symptoms that were being reported at least *since January 2019*" (emphasis added), which "presented a second opportunity to have diagnosed the RCC at a more limited stage that at most entailed local extension which carries a significantly improved prognosis than Stage IV disease." In this respect, he concluded that the presence of renal cell carcinoma "*could have been discovered and curatively treated as a result of his initial diagnosis of DLBCL had Dr. Leonard been managing the DLBCL according to the establish[ed] standard of care*" (emphasis added).

In reply, the defendants submitted an attorney's affirmation, in which counsel asserted that Dr. Elfiky's opinions were conclusory and speculative, and not premised upon the medical records. Counsel reiterated the legal arguments that the defendants had propounded in their motion papers, including their argument that, even if Leonard was obligated by the standard of care to take additional PET or CT scans between February 27, 2014 and October 15, 2019 to ascertain whether the plaintiff's lymphoma had recurred, no liability can be imposed upon the

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL       Page 23 of 28**
**Motion No.  002**

[* 23]

defendants for failing to recognize the presence of a completely different cancer that was unrelated to the lymphoma. Counsel asserted that, in any event, Dr. Elfiky did not expressly conclude that, if a recognizably slow-spreading cancer such renal cell carcinoma was indeed present at any point during that interval, a PET, CT, or PET/CT scan *would*, in fact, have revealed its presence, as opposed to the hope that it *could* have detected the new cancer.

The court concludes that the defendants established their prima facie entitlement to judgment as a matter of law in connection with the medical malpractice cause of action by their submissions, including Dr. Soiffer's expert affirmation. The plaintiff, however, failed to raise triable issues of fact in opposition to this showing, as Dr. Elfiky's affirmation asserted only that the defendants' alleged failure to investigate the recurrence of lymphoma in a specific manner, that is, via additional PT, CT, or PET/CT scans, could have led to an incidental discovery of unrelated renal cell carcinoma, a condition that remained unindicated up to and including 2019. As explained above, this situation does not provide a basis upon which to impose liability on the defendants (*see Rotante v New York Presbyterian Hospital-New York Weill Cornell Med. Ctr.*, 175 AD3d at 1144; *David v Hutchinson*, 114 AD3d at 413). In other words, Dr. Elfiky's opinion is simply that the defendants were "guilty of failing to discover" renal cell carcinoma "by accident" (*Curry v Dr. Elena Vezza Physician, P.C.*, 106 AD3d at 413-414), which cannot support a claim for medical malpractice. To the extent that Dr. Elfiky suggested that the weight loss and night sweats that the plaintiff experience during 2018 and 2019 should have caused Leonard to test for renal cell carcinoma, Dr. Elfiky provided no opinion that such complaints, without more, should have led an oncologist specializing in lymphoma to suspect such an etiology. Nor did Dr. Elfiky expressly opine that it constituted a departure from good and accepted practice for Leonard to forego more specific testing for that disease. Moreover, inasmuch as Dr. Elfiky did not address Dr. Soiffer's opinions that the defendants did not depart from good and accepted practice in the other ways claimed by the plaintiff in his complaint and bills of particulars, or that no other such acts or omissions on the defendants' part caused or

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL          Page 24 of 28**
**Motion No.  002**

contributed to renal cell carcinoma, the plaintiff failed to raise a triable issue of fact in connection with his other claims of medical malpractice, and that branch of the defendants' motion seeking summary judgment dismissing the medical malpractice cause of action must thus be granted.

The elements of a cause of action to recover for lack of informed consent are:

> "(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury"

(*Spano v Bertocci*, 299 AD2d 335, 337-338 [2d Dept 2002]; *see Zapata v Buitriago*, 107 AD3d 977, 979 [2d Dept 2013]; *Balzola v Giese*, 107 AD3d 587, 588 [1st Dept 2013]; *Shkolnik v Hospital for Joint Diseases Orthopaedic Inst*., 211 AD2d 347, 350 [1st Dept 1995]).  For a statutory claim of lack of informed consent to be actionable, a defendant must have engaged in a "non-emergency treatment, procedure or surgery" or "a diagnostic procedure which involved invasion or disruption of the integrity of the body" (Public Health Law § 2805-d[2]). "'[T]his showing of qualitative insufficiency of the consent [is] required to be supported by expert medical testimony'" (*King v Jordan*, 265 AD2d at 260, quoting *Hylick v Halweil*, 112 AD2d 400, 401 [2d Dept 1985]; *see* CPLR 4401-a; *Gardner v Wider*, 32 AD3d 728, 730 [1st Dept 2006]). Hence, where a defendant establishes his or her prima facie entitlement to judgment as a matter of law in connection with a lack of informed consent cause of action by submitting an expert affirmation from a physician, a plaintiff can only raise a triable issue of fact by submitting "an expert affirmation stating with certainty that the information defendant[ ] allegedly provided to plaintiff before the [medical] procedures at issue departed from what a reasonable practitioner would have disclosed" (*Leighton v Lowenberg*, 103 AD3d 530, 530 [1st Dept 2013]).

"A failure to diagnose cannot be the basis of a cause of action for lack of informed consent unless associated with a diagnostic procedure that 'involve[s] invasion or disruption of

the integrity of the body'" (*Janeczko v Russell*, 46 AD3d 324, 325 [1st Dept 2007], quoting Public Health Law § 2805-d[2][b]; *see Lewis v Rutkovsky*, 153 AD3d at 456).

As Dr. Soiffer explained it, the plaintiff vaguely claimed a lack of informed consent with respect to the treatment rendered to him, specifically, that the defendants did not inform the plaintiff of the risks and benefits of, and alternatives to, R-CHOP therapy, that he was not advised of the risks of not having "all clear" scans, and that he was not advised of his risk of renal cell carcinoma. He concluded, however, that there was no link whatsoever between lymphoma and renal cell carcinoma, and, hence, there was no merit to any claim that the plaintiff should have been advised of the risk of contracting renal cell carcinoma. Dr. Soiffer concluded that, inasmuch as ss surveillance imaging was not required by the standard of care, nor was it warranted in this instance, there was no need to discuss the risks and benefits of, or alternatives to, such imaging. In any event, Dr. Soiffer opined that Leonard indeed discussed the risks, benefits, and toxicity profile of, and the usual course of response to, R-CHOP therapy with the plaintiff, and that Lenoard reviewed "monitoring and expectations" with the plaintiff.

Dr. Soiffer further asserted that it is known that chemotherapy and immunotherapy treatments are not without side effects, and that Leonard discussed the potential side effects with the plaintiff, as well as providing books on the subject to him. He noted that the plaintiff consented to proceed with R-CHOP therapy, and that, while most side effects will eventually subside, some side effects can be long-term or permanent, but that none of the side effects suffered by plaintiff was secondary to any side effects from R-CHOP therapy.

The defendants thus established their prima facie entitlement to judgment as a matter of law in connection with the lack of informed consent cause of action. Inasmuch as Dr. Elfiky did not address the defendants' showing in this regard, the plaintiff failed to raise a triable issue of fact in opposition thereto, and, hence, that branch of the defendants' motion seeking summary judgment dismissing the lack of informed consent cause of action must be granted.

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL          Page 26 of 28**
**Motion No.  002**

[* 26]

26 of 28

To establish a cause of action to recover for negligent hiring, supervision, training, and retention of health-care personnel, a plaintiff must demonstrate that the defendants either "knew, or should have known," of their employees' "propensity for the sort of conduct which caused the [patient's] injury" (*Sheila C. v Povich*, 11 AD3d 120, 129-130 [1st Dept 2004]; *see Kuhfeldt v New York Presbyt./Weill Cornell Med. Ctr*., 205 AD3d 480, 481-482 [1st Dept 2022]). Since the plaintiff adduced no facts with respect to whether the defendants knew or should have known of the propensity of their physicians' assistants, nurses, or health-care employees to commit acts of malpractice, let alone Leonard's propensities, that branch of the defendants' motion seeking summary judgment dismissing that cause of action must be granted.

"'In general, under the doctrine of respondeat superior, a hospital may be held vicariously liable for the negligence or malpractice of its employees acting within the scope of employment'" (*Valerio v Liberty Behavioral Mgt. Corp*., 188 AD3d 948, 949 [2d Dept 2020], quoting *Seiden v Sonstein*, 127 AD3d 1158, 1160 [2d Dept 2015]; *see Hill v St. Clare's Hosp*., 67 NY2d 72, 79 [1986]; *Dupree v Westchester County Health Care Corp*., 164 AD3d 1211, 1213 [2d Dept 2018]). Since this court has determined that no triable issues of fact exist as to whether Leonard committed malpractice, there is no dispute that Leonard was NYPH's employee, and the plaintiff has pointed to no act or omission of any other NYPH employee that constituted tortious conduct, there are no triable issues of fact as to whether NYPH may be held vicariously liable here for Leonard's conduct, or whether it may be held liable for the conduct of any of its other employees. Hence, that branch of the defendants' motion seeking summary judgment dismissing the complaint insofar as asserted against NYPH must be granted.

Accordingly, it is,

ORDERED that the defendants' motion for summary judgment dismissing the complaint is granted, and the complaint is dismissed in its entirety; and it is further,

ORDERED that the Clerk of the court shall enter judgment accordingly.

**805185/2021  MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL**                **Page 27 of 28**
**Motion No.  002**

[* 27]

27 of 28

This constitutes the Decision and Order of the court.

5/5/2025
**DATE**

**JOHN J. KELLEY, J.S.C.**

| CHECK ONE: | X | CASE DISPOSED | | | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|
| | X | GRANTED | | DENIED | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | | REFERENCE |

**805185/2021   MARINO, ROBERT vs. THE NEW YORK AND PRESBYTERIAN HOSPITAL ET AL       Page 28 of 28**
**Motion No.  002**